UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FREEDOM WIRELESS, INC.,

Plaintiff,

v.

BOSTON COMMUNICATIONS GROUP,
INC., and NEXTEL COMMUNICATIONS,
INC.

Defendants.

CIVIL ACTION No. 05-11061-EFH

## **DECLARATION OF JOHN KENNETH FELTER**

I, John Kenneth Felter, declare as follows:

(1)    I am a partner at Goodwin Procter LLP, attorneys for Freedom Wireless, Inc.  I submit this declaration based on my personal, first-hand knowledge.

(2)    Attached as Exhibit A is a true and correct copy of the Emergency Motion of Boston Communications Group, Inc. to Construe or Stay the District Court's Injunction filed in the United States Court of Appeals for the Federal Circuit, No. 06-1020 on November 14, 2005.

(3)    Attached as Exhibit B is a true and correct copy of the Reply Brief in Support of Emergency Motion of Boston Communications Group, Inc. to Construe or Stay the District Court's Injunction filed in the United States Court of Appeals for the Federal Circuit, Nos. 06-1020, -1078, -1079 on November 28, 2005.

(4)    Attached as Exhibit C is a true and correct copy of Nextel's Motion to Intervene for Limited Purpose filed in the United States Court of Appeals for the Federal Circuit, No. 06-1020 on November 14, 2005.

(5)    Attached as Exhibit D is a true and correct copy of Nextel's Motion to Stay Injunction Pending Appeal filed in the United States Court of Appeals for the Federal Circuit, No. 06-1020 on November 14, 2005.

(6)    Attached as Exhibit E is a true and correct copy of Nextel's Reply in Support of Motion to Intervene for Limited Purpose filed in the United States Court of Appeals for the Federal Circuit, Nos. 06-1020, -1078, -1079 on November 28, 2005.

(7)    Attached as Exhibit F is a true and correct copy Nextel's Reply in Support of Motion to Stay Injunction Pending Appeal filed in the United States Court of Appeals for the Federal Circuit, Nos. 06-1020, -01078, -1079 on November 28, 2005.

(8)    Attached as Exhibit G is a true and correct copy of a letter to The Honorable Jan Horbaly, Clerk of Court, United States Court of Appeals for the Federal Circuit, from Donald R. Dunner, Counsel for Boston Communication Group, Inc., dated November 28, 2005.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and this declaration was executed on December 7, 2005 in Boston, Massachusetts.

/s/ John Kenneth Felter

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FREEDOM WIRELESS, INC.,

               Plaintiff,

      v.

BOSTON COMMUNICATIONS GROUP,
INC., and NEXTEL COMMUNICATIONS,
INC.

               Defendants.

CIVIL ACTION No. 05-11061-EFH

**EXHIBITS TO**
**OPPOSITION OF FREEDOM WIRELESS, INC. TO DEFENDANT BOSTON**
**COMMUNICATIONS GROUP, INC.'S MOTION FOR A STAY OF PROCEEDINGS**
**PENDING RESOLUTION OF THE FEDERAL CIRCUIT APPEALS**

# EXHIBIT A

06-1020

IN THE

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

FREEDOM WIRELESS, INC.,

*Plaintiff/Counterclaim Defendant-*
*Appellant,*

v.

BOSTON COMMUNICATIONS GROUP, INC.,

*Defendant/Counterclaimant-*
*Appellee, et al.*

EMERGENCY MOTION OF BOSTON COMMUNICATIONS GROUP, INC.
TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue
Washington, DC  20001-4413
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
(650) 849-6600

*Attorneys for Defendant/Counterclaimant-*
*Appellee Boston Communications Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.     STATUS OF MATTER .......................................................................................... 1

II.    PRELIMINARY STATEMENT ............................................................................ 2

III.   STATEMENT OF FACTS ..................................................................................... 4

       A.    The Patents in Suit ....................................................................................... 4

             1.    The Required Step of "Directly" Connecting Calls from the
                   Prepaid System to the LEC ............................................................... 5

             2.    The Required "Periodic Validation" Accounting Method ................ 5

       B.    BCGI's Prepaid Service Bureau .................................................................. 7

       C.    The CSI Prior Art ........................................................................................ 9

       D.    The Jury's Verdict ..................................................................................... 11

IV.    ARGUMENT ....................................................................................................... 12

       A.    BCGI's Appeal Will Likely Succeed ........................................................ 12

             1.    The Injunction Is Impermissibly Broad ......................................... 12

             2.    The District Court Erroneously Instructed the Jury on Joint
                   Infringement .................................................................................... 13

             3.    No Reasonable Jury Could Conclude That the Defendants Infringe
                   the 17 "Direct Connection" Claims Under the Doctrine of
                   Equivalents ...................................................................................... 15

             4.    No Reasonable Jury Could Conclude That BCGI's Service Bureau
                   Performs "Periodic Validation" ...................................................... 16

             5.    The Remaining Claims Are Invalid ................................................ 16

       B.    BCGI Will Be Irreparably Harmed Unless Its Requested Relief Is Granted ........ 17

       C.    Freedom Will Not Be Harmed If BCGI's Requested Relief Is Granted ............... 18

       D.    The Public Will Be Harmed If a Stay Is Not Granted ............................... 19

V.     CONCLUSION ..................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Advanced Display Sys. v. Kent State Univ.,*
    212 F.3d 1272 (Fed. Cir. 2000) .................................................................... 17

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005) .................................................................... 14

*CytoLogix Corp. v. Ventana Med. Sys., Inc.,*
    424 F.3d 1168 (Fed. Cir. 2005) .................................................................... 16

*E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.,*
    835 F.2d 277 (Fed. Cir. 1987) ...................................................................... 19

*Int'l Rectifier Corp. v. IXYS Corp.,*
    383 F.3d 1312 (Fed. Cir. 2004) .................................................................... 13

*J & M Corp. v. Harley-Davidson, Inc.,*
    269 F.3d 1360 (Fed. Cir. 2001) .................................................................... 15

*KSM Fastening Sys. v. H.A. Jones Co., Inc.,*
    776 F.2d 1522 (Fed. Cir. 1985) .................................................................... 13

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001) .................................................................... 16

*Seachange Int'l, Inc. v. C-Cor Inc.,*
    413 F.3d 1361 (Fed. Cir. 2005) .................................................................... 15

*Searfoss v. Pioneer Consol. Corp.,*
    374 F.3d 1142 (Fed. Cir. 2004) .................................................................... 15

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.,*
    897 F.2d 511 (Fed. Cir. 1990) ...................................................................... 12

**Other Authorities**

Mark A. Lemley, et al., *Divided Infringement Claims,*
    33(3) AIPLA Q.J. 255 (2005) ........................................................................ 14

## I.    STATUS OF MATTER

Boston Communications Group, Inc. ("BCGI") provides accounting-related services (principally call rating and debiting services) in connection with prepaid wireless (cellular) telephone calls.  BCGI provides its services (called a "service bureau") to a number of wireless carriers, including its codefendant carriers.

Following a jury verdict that BCGI and its codefendant carriers "jointly" infringed the '067 and '823 patents owned by Freedom Wireless, Inc. ("Freedom"), the district court denied BCGI's JMOL motions and entered a permanent injunction.  Ex. 1 (Oct. 17, 2005 Order for Permanent Injunctive Relief).[1]  Freedom has stated that the injunction extends beyond the activities of BCGI and its codefendants, and prohibits BCGI from acting in concert with *any* third party to provide prepaid wireless services.  Ex. 2 (Freedom Press Release).  On November 9, 2005, the district court—without opinion—denied BCGI's motion for clarification or stay, in which BCGI asked the court either to clarify that its injunction did not apply to non-defendant carriers or, if it did, to stay that aspect of its injunction pending appeal.  Further, while BCGI made a fallback request asking the court at least to grant a temporary stay for two weeks (to give BCGI time to seek a stay pending appeal from this Court), in denying BCGI's motion, the district court said nothing about that request.

---

[1] BCGI filed a notice of appeal on October 20, 2005.  Due to administrative delays at the district court, however, BCGI's appeal has not yet been docketed in this Court.  Accordingly, BCGI is filing this motion in Freedom's appeal from the same case below.

BCGI therefore requests that this Court either (1) construe the district court's injunction not to apply to non-defendant carriers, or (2) to the extent it does cover non-defendant carriers, stay the injunction pending resolution of BCGI's appeal. BCGI does not seek to stay the injunction as it applies to the defendant carriers. Further, to preserve the status quo, BCGI asks the Court to issue a temporary stay to last only until the Court rules on this motion. BCGI has discussed this motion with the other parties to this appeal. Freedom objects and intends to respond.

## II.   PRELIMINARY STATEMENT

If Freedom's interpretation of the injunction is correct, it is a death warrant for BCGI. Freedom's interpretation goes far beyond the jury verdict, which found that each carrier defendant and BCGI jointly infringe Freedom's two patents. Indeed, the verdict was expressly limited to the *combined* activities of BCGI and each carrier defendant, and was based on evidence that was specific to each carrier's use of BCGI's service bureau. In fact, the carrier-specific nature of Freedom's allegations had previously led the district court to rule that whether the patents are jointly infringed by BCGI and other, *non-defendant* carriers—whose activities are now at issue in *other* cases that Freedom filed—is beyond the scope of this case.

Unless the injunction is construed not to cover non-defendant carriers, or is stayed to the extent it does, BCGI is unlikely to survive to see this Court's decision on the merits. And the merits of BCGI's appeal are substantial. For example, while this Court has never directly decided the issue, it has suggested that an agency or similar control relationship would be required if the activities of two

2

parties were to be combined to prove direct infringement. The district court, however, imposed no such requirement in this case.

Further, the district court failed to enforce two clear estoppels that mandate a judgment of non-infringement on all but five claims. First, the district court expressly found that Freedom had disclaimed (both in the specification and during prosecution) anything other than a direct connection between two claimed components, yet permitted the jury to find that the defendants, who (at most) connect those two components indirectly, infringed the relevant claims under the doctrine of equivalents. Second, the district court found that the "periodic validation" accounting method described in Freedom's patents was an "important" part of the claimed invention and interpreted every claim with an accounting step to require periodic validation. Yet, even though BCGI uses an accounting method of the precise type that Freedom criticized and distinguished from its own method of "periodic validation," the district court let the jury's infringement verdict on these claims stand.

The remaining five claims, which deal with very basic methods of call forwarding and verification (but not periodic validation), are anticipated by a prior art system described in a publicly available brief and supporting testimony filed in a California administrative proceeding. BCGI's expert provided a detailed explanation of that documentation and how it taught every element of the five remaining claims. Notably, Freedom never offered an expert or other evidence to challenge BCGI's evidence. Instead, Freedom relied only on the arguments of its

3

attorney, who focused on irrelevancies such as limitations that were in *other* claims or whether the prior art included flow-charts.

BCGI has the right to ask this Court to redress these (and other) errors. That right, however, is of no value to BCGI if it goes bankrupt during this appeal. Accordingly, BCGI respectfully requests that this Court stay the district court's injunction during the pendency of this appeal, but only as it concerns BCGI's activities with non-defendant carriers.

## III. STATEMENT OF FACTS

### A. The Patents in Suit

The '067 and '823 patents (Exs. 3 and 4) share a common specification (all specification cites are to the '823 patent) and are directed to a prepaid service that interfaces with a conventional wireless telecommunications system. Figure 1 "generally describe[s] the system of the present invention." Ex. 4 at 5:5-8. In this system, a phone call is received at a wireless carrier's Mobile Telephone Switching Office ("MTSO") (8) via cell tower (4). *Id.* at 3:55-61. The MTSO then determines whether the caller is a prepaid subscriber. *Id.* at 5:28-35. If not, the call is forwarded, in the conventional manner, from the MTSO to the Local Exchange Carrier ("LEC") (20), which completes the call. *Id.* at 5:17-21. If the subscriber is prepaid, however, the MTSO forwards the call to prepaid service provider (10) having a host computer (16), which validates the account and then, assuming the account is valid, forwards the call *directly to* the LEC. *Id.* at 5:25-35; 5:66-6:10.

4

1.    **The Required Step of "Directly" Connecting Calls from the Prepaid System to the LEC**

A prepaid service provider/host computer that connects prepaid calls to the LEC is an important part of the invention. The service provider of "the invention" is repeatedly described as being responsible for directing prepaid calls to the LEC (*see id.* at 4:15-19; 6:8-10; 8:17-21), and Freedom repeatedly emphasized its importance while prosecuting claims that recited a "pre-paid switching system." *See* Ex. 5 (Nov. 25, 1996 Amend.) at 2, 4-5; Ex. 6 (Mar. 26, 1997 Amend.) at 6-7; Ex. 7 (Mar. 14, 1997 facsimile) at 2.

Indeed, so important is this method of connecting calls to the invention that the district court expressly found that Freedom had disclaimed anything other than a direct connection between the LEC and the prepaid system for any claim reciting a "pre-paid switching system" or requiring the prepaid system to connect the call. Ex. 8 (Apr. 23, 2003 Claim Construction Order) at 14, 16. This disclaimer is reflected in the district court's construction of 17 of the 32 asserted claims: '067 patent claims 10-14, 16, and 18; and '823 patent claims 29-31, 34, 36, 39, 42, 53, 57, and 59. *See* Ex. 9 (claim construction submitted to jury).

2.    **The Required "Periodic Validation" Accounting Method**

The specification also describes a "periodic validation" accounting method. *See* Ex. 4, Fig. 7; 8:33-9:15. This method periodically validates the account and "decrements" (deducts from) the subscriber's account balance *while the call is in progress. Id.* at 4:20-25. While money can be directly taken from the account, in the preferred embodiment the account balance is converted into a time value that is

5

based on, for example, the time of day, the number being called, etc. *Id.* at 8:38-56. As the call progresses, the account balance is periodically reduced in intervals that correspond to minimum billing increments of currency or time. *Id.*

The periodic validation of the account using the "time value" embodiment is illustrated in the flow chart of Fig. 7. As shown in block 132 of that figure, the periodic validation is set to occur every minute (although it could be set for other billing increments (*see id.* at 8:42-43)). Accordingly, each time a minute elapses in the computer's timer, another validation request is made of the account until the account lacks sufficient funds for another billing increment and the call is disconnected. *See id.* at 8:57-67; Fig. 7 (loop 128-32).

The patent's "Summary of the Invention" emphasizes periodic validation, stating that "[i]t is important to note the time value is deducted from the account balance at regular intervals of time while the call is in progress" and that the amount deducted is "based upon elapse of pre-determined time periods at the predetermined time value for cellular telecommunications." *Id.* at 4:20-25.

The specification also contrasts "periodic validation" with a prior art method, typified by the prior art "D'Urso telecommunications system," that calculates a maximum call duration at the beginning of the call based on the account balance that was available before the call began and then sets an alarm or timer using the computer's internal clock. *See id.* at 3:15-35. The specification stresses the significance of the difference between "periodic validation" and alarm-based systems, like D'Urso, that update the balance after a call has ended. For example, immediately after describing the call accounting feature of D'Urso, the

6

specification states that its invention "is fundamentally different" from D'Urso. *Id.* at 3:36-40. Freedom also distinguished D'Urso from the invention on this basis during prosecution, arguing that a limitation reciting "decrementing the subscriber account balance at regular intervals during the telecommunications event" was "not disclosed or suggested by" D'Urso. Ex. 10 (Jun. 17, 1996 Amend.) at 6, 12.

In construing the claims that recited some kind of accounting, the district court recognized that Freedom described validation at regular intervals as an "'important' part of the invention." Ex. 8 at 34 It therefore construed claims 10-14 and 16-18 of the '067 patent and claims 2-3, 5, 9, 11, 12, 15, 17, 19, 20, 29-31, 34, 36, 39, 42, 53, 57, and 59 of the '823 patent accordingly. *See* Ex. 9.

**B.    BCGI's Prepaid Service Bureau**

Three implementations of BCGI's service bureau are at issue in Freedom's suit: the Multi-Frequency ("MF") implementation, the SS7 implementation, and the Pre-IN implementation. Ex. 11 (Mar. 11, 2005 Trial Tr.) at 77-79. However, BCGI does not use these implementations to provide prepaid wireless services to cellular subscribers. Rather, it is the wireless carriers that interface with subscribers using their own networks. For example, the wireless carriers' equipment determines that a call is from a prepaid wireless subscriber; if it is, information about the subscriber and the call is sent to BCGI's service bureau. Ex. 12 (Apr. 13, 2005 Trial Tr.) at 43-45.

In the MF implementation, for example, the carrier's MTSO (labeled "switch" in the figure below) transfers the call to the BCGI "Node," a computer that is physically located near the MTSO (*id.* at 45):

7



The Node then passes subscriber and call information to a central computer, called a "Responder," located in one of BCGI's Massachusetts facilities. *Id.* The Responder calculates the maximum duration of the call based on the balance available in the subscriber's account and sends that information back to the Node, which—as in the D'Urso prior art system—sets an alarm. *Id.* at 45-46. At that point, the Node sends the call back to the MTSO, which then completes the call by, for example, forwarding it to an LEC. *Id.* at 47. Since the carrier's MTSO is responsible for completing the call, no component of the BCGI service bureau connects the call to the LEC. *Id.* If the maximum call duration is reached, the alarm goes off and the call is disconnected. *Id.* at 65-66. Upon termination of the call (either because one party hangs up or the maximum call duration is reached), the Node informs the Responder of the end time of the call and the Responder re-calculates the available balance in the subscriber's account. *Id.* Thus, the BCGI service bureau—again like D'Urso—is incapable of updating a subscriber's account while a call is in progress. *Id.* at 72-74.

The SS7 and Pre-IN implementations similarly do not directly connect calls to an LEC. *Id.* at 78, 87-88, 95; *see also* Ex. 13 (Mar. 14, 2005 Trial Tr.) at 125. Likewise, both the SS7 and Pre-IN implementations calculate the maximum call

8

duration before the call begins and set an ordinary computer clock alarm. Ex. 12 at 88, 94; Ex. 13 at 81; Ex. 14 (Mar. 15, 2005 Trial Tr.) at 34.[2]

## C.    The CSI Prior Art

In November 1991, Cellular Service, Inc. ("CSI") filed a proposal with the California Public Utilities Commission ("CPUC") requesting it to order wireless carriers doing business in California to allow CSI to connect its own system to the carriers' switches (MTSOs). Ex. 15 (Opening Brief of Cellular Service, Inc.) at 3-8. CSI's proposal included a brief (Ex. 15) and supporting testimony, including the written testimony of Donald Raney (Ex. 16), Harry Midgley (Ex. 17), and Ralph Widmar (Ex. 18), that were available to the public as of the brief's filing in the CPUC on November 7, 1991. (*See* date stamp on Ex. 15.) Freedom's first patent application was filed more than three years later (on December 23, 1994).

The CSI brief generally describes the CSI system and the services that CSI intended to provide with it, specifically citing the written testimony that CSI presented to the CPUC. Ex. 15 at 2. These materials were discussed at trial by BCGI's expert (Professor Wicker), who testified that the CSI proposal anticipates claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. These five claims, unlike the other asserted claims, do not require "periodic validation" or a direct connection between the prepaid service and LEC. Ex. 9. Instead, they describe only very basic methods of forwarding a prepaid call to a prepaid service

---

[2] Although there are significant differences among the various BCGI implementations that affect some of BCGI's other non-infringement defenses, the characteristics described in this motion that should have led to a finding of non-infringement are shared by every implementation.

provider that (in claims 1, 27, and 28 only) performs a simple verification of a valid account. Professor Wicker explained how the CSI proposal anticipated all of these claims. Ex. 12 at 17-19; Ex. 19 (Apr. 12, 2005 Trial Tr.) at 121-122.

For example, the CSI proposal (in Widmar's testimony) describes a host of services that CSI intended to provide, including prepaid service. Ex. 18 at 8 ("[c]ustomers who present credit risks could be required to pre-pay for service"). Moreover, the proposal (in Midgley's testimony) set out in great detail the technology that made CSI's services possible. Ex. 17 at 1-22. And Professor Wicker explained to the jury where Midgley described how the MTSO would forward the calls of CSI's customers (including prepaid subscribers) to CSI's system, which also verifies the prepaid subscriber's account. Ex. 19 at 48-52. Professor Wicker concluded that the CSI proposal anticipates claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. Ex. 19 at 101-106, 121-122; Ex. 12 at 17-19.

Freedom offered no competing evidence. Instead, Freedom's counsel personally attacked Professor Wicker and argued his testimony should be disregarded because (1) the CSI proposal failed to describe either periodic validation or cutting off a call when funds run out (Ex. 20 (May 11, 2005 Trial Tr.) at 175), notwithstanding that numerous claims (including the five discussed here) did not include those limitations; (2) the CSI documentation mentioned prepaid service just once (*id.* at 126-127, 174-175); (3) there were no flowcharts in the CSI materials (*id.* at 175); and (4) Professor Wicker relied on numerous documents (the

10

CSI brief and supporting affidavits), but anticipation requires all claim elements to be present in a single document (Ex. 21 (Apr. 15, 2005 Trial Tr.) at 101-106).

### D.     The Jury's Verdict

Because neither BCGI alone nor the carriers alone performed every step of any claim, Freedom asserted, and the district court agreed, that the jury could combine the actions of BCGI and the defendant carriers to find direct infringement. Ex. 22 (jury verdict forms).  However, the district court refused to allow Freedom to assert that BCGI's use of its service bureau for other, non-defendant carriers constituted infringement (Ex. 23 (Order dated April 27, 2005) at 1), explaining that the non-defendant carriers' conduct was not part of this case and that Freedom would have to file separate actions to "pursue claims arising from conduct involving non-defendant carriers" (*id.* at 2), which Freedom has now done (Exs. 24 and 25 (*Freedom v. Alltel/BCGI* and *Nextel/BCGI* complaints)).  Accordingly, the jury considered only the activities of BCGI and the carrier defendants.  Ex. 22.

The jury found joint infringement of the asserted claims by BCGI and the carriers, but did so following improper, overbroad instructions to which BCGI had objected.  Specifically, after the district court rejected BCGI's arguments that joint infringement can occur, if at all, only where one party controls the actions of the other (such as where there is an agency relationship), the jury was instructed that Freedom need only prove that BCGI and the carriers "work together to perform all of the steps of a claim." Ex. 26 at 9-10.

Further, notwithstanding that every implementation of the BCGI system lacks a direct connection to the LEC, the jury concluded that the "direct

11

connection" claims were nevertheless infringed under the doctrine of equivalents. The jury also found that the defendants infringed all of the "periodic validation" claims, even though, like D'Urso, BCGI uses an alarm and deducts from the subscriber's account balance only after a call ends. *See* pages 8-9 *supra.*

Finally, the jury found that BCGI did not prove that claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent were anticipated, notwithstanding BCGI's uncontested evidence that every feature of those claims could be found in the CSI proposal.

## IV.  ARGUMENT

Whether an injunction should be stayed pending appeal involves four considerations:  (1) likelihood of success on the merits, (2) irreparable harm to the moving party; (3) substantial harm to the non-moving party; and (4) the public interest. *Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990).  Where the harm resulting from denial of the stay is considerable, however, a lesser showing is required regarding likelihood of success.  All that is required is that the moving party raise a substantial issue. *Id.* at 513.

### A.    BCGI's Appeal Will Likely Succeed

#### 1.    The Injunction Is Impermissibly Broad

Freedom insists the injunction against BCGI's use of its service bureau for non-defendant carriers extends the jury's verdict in this case to cover the activities of non-parties, including those that are currently the subject of separate, pending litigations where the issues of infringement, validity, and enforceability are contested.  That cannot be correct.  There is no evidence in the record that any

12

alleged conduct of BCGI and the non-defendant carriers constitutes joint infringement, even under the district court's erroneous instructions, or that it is "not more than colorably different" from the conduct found to infringe. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) ("[T]he only acts [an] injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices not more than colorably different from the adjudicated devices."). In this context, therefore, separate lawsuits (which are now underway) are required to determine whether the joint conduct of other carriers and BCGI infringes, and that conduct cannot be enjoined. *See KSM Fastening Sys. v. H.A. Jones Co., Inc.*, 776 F.2d 1522, 1531 (Fed. Cir. 1985) (injunction cannot cover activity that requires litigation of "substantial new issues").[3]

### 2.    The District Court Erroneously Instructed the Jury on Joint Infringement

The judgment of infringement in this case rests entirely on Freedom's theory, adopted by the district court in its jury instructions, that there could be joint direct infringement even without a showing that BCGI controlled the actions of a carrier defendant (or vice versa). That is, it is enough (following Freedom's joint infringement theory) if one party performs some of a claim's steps and a second party performs the remaining steps. This Court, however, has never directly addressed whether such a "joint infringement" theory exists, much less adopted the theory. Indeed, if anything, this Court's recent decision in *Cross Medical*

---

[3] Freedom has in fact filed separate lawsuits against other carriers, including intervenor Nextel, which deals with this issue in more detail in its brief. BCGI will not repeat those arguments here, but instead joins Nextel's brief.

*Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), suggests that the Court would likely reject the theory. There, the Court rejected the patentee's argument that the actions of surgeons could be joined with those of the defendant medical device manufacturer to establish direct infringement by the manufacturer, observing that no agency relationship existed between the surgeons and the manufacturer. *Id.* at 1311.

Moreover, as Professor Lemley of Stanford Law School recently observed, an "important policy purpose" is served by preventing patentees from pursuing joint infringement theories where different entities separately perform claimed steps without any one of them controlling the actions of the others:

> Direct infringement is a strict-liability offense, but it is limited to actually performing all the steps of a patented process. By contrast, indirect liability requires evidence of "specific intent" to induce infringement, or knowledge that a good is specially adapted for aiding infringement and has no other use. Construing the patent laws to permit the individual, non-infringing acts of unrelated parties together to add up to infringement would render both § 271(b) and § 271(c) meaningless. . . . [O]n a theory of joint infringement, no one need ever sue for inducement.

Mark A. Lemley, et al., *Divided Infringement Claims*, 33 AIPLA Q.J. 255, 261-62 (2005).

Assuming that this Court holds that there is such a thing as joint infringement, but that it requires proof of an agency or similar "control" relationship between the parties, a directed judgment in BCGI's favor would be required because Freedom presented no evidence of such a relationship. Similarly,

if this Court were to impose an intent or knowledge requirement, a new trial would be required, since the jury was never instructed that intent or knowledge was needed to establish liability.

### 3. No Reasonable Jury Could Conclude That the Defendants Infringe the 17 "Direct Connection" Claims Under the Doctrine of Equivalents

The district court expressly found during claim construction that Freedom had disclaimed any connection other than a direct one from the prepaid switching system to the LEC. The natural consequence of that finding was that Freedom should have been precluded from proving infringement under the doctrine of equivalents. *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1368 (Fed. Cir. 2001) ("Structure expressly disclaimed in the specification, of course, cannot be considered an equivalent under the doctrine of equivalents.").

Further, the "all-elements-rule" prevents a finding that a system, like BCGI's, that does not connect calls directly to an LEC infringes any claim requiring a direct connection. *See, e.g., Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005) (rejecting the argument that "indirect [computer network] interconnections can be equivalent to a network in which every processor is connected to every other processor by direct, point-to-point interconnections" because "such a theory would vitiate the requirement that every processor be connected to every other processor point-to-point"); *see also Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004) ("[W]e must . . . agree with the district court that, 'to find, as [Searfoss] argue[s], that the 'indirect connection'

15

constitutes an equivalent of the direct connection function described in Claim 3 would, in effect, completely vitiate the connection function.'").[4]

### 4. No Reasonable Jury Could Conclude That BCGI's Service Bureau Performs "Periodic Validation"

As a matter of law, none of the "periodic validation" claims can be infringed, either literally or under the doctrine of equivalents, by the defendants. As explained above, Freedom's patent contrasts the invention's accounting method with prior art accounting methods, like the one employed by the D'Urso prior art system, that set an alarm based on a maximum call duration calculated before the call begins. Yet, this is exactly the kind of accounting method employed by BCGI. Therefore, Freedom should have been prevented, as a matter of law, from asserting that the defendants infringe any claim requiring periodic validation. *See Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345-47 (Fed. Cir. 2001) (patentee cannot prove infringement where accused product possesses feature "specifically identified, criticized, and disclaimed" in the specification).

### 5. The Remaining Claims Are Invalid

The only claims not subject to the two non-infringement arguments discussed above are claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent. All of the limitations of these claims, however, were described in the

---

[4] Freedom challenged both the "periodic validation" and "direct connection" claim constructions below. Even if it successfully challenged those constructions in this Court, however, this Court could not affirm the judgment. In that situation, BCGI would be entitled to a new trial on invalidity, since the jury was required to apply the correct construction in considering BCGI's invalidity arguments. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1176 (Fed. Cir. 2005).

CSI proposal made more than a year before the Freedom patents were filed. *See* pages 9-10 *supra*. Freedom provided no evidence to rebut Professor Wicker's testimony, and the criticisms of the CSI proposal raised by Freedom's trial counsel are irrelevant (*see* pages 10-11 *supra*) and could not have provided the jury with a legitimate basis for rejecting BCGI's uncontradicted evidence. In particular, the limitations that Freedom's counsel alleged were missing from the CSI proposal (periodic validation and mid-call cut-off) do not appear in these five claims. Moreover, there is no requirement that the prior art include flow charts or mention a concept (prepaid service) multiple times to anticipate.

Similarly irrelevant is Freedom's argument that Professor Wicker relied on multiple documents in putting together his anticipation testimony. The documents Professor Wicker relied on—the CSI brief and supporting testimony—were all part of an integrated document (the brief) and collectively describe different aspects of a single system. The jury was not free to disregard Professor Wicker's analysis simply because it relied on more than one document. *See Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1282-83 (Fed. Cir. 2000) ("Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document.")

In sum, therefore, no reasonable jury could have concluded that claim 15 of the '067 patent and claims 1, 27, 28, and 35 of the '823 patent are not invalid.

**B.     BCGI Will Be Irreparably Harmed Unless Its Requested Relief Is Granted**

The verdict itself, and the injunction's prohibition against continuing to supply services to its codefendant carriers, have left BCGI in an extremely tenuous

17

financial position.  Ex. 27 (Affidavit of E. Snowden), ¶¶ 3-5.  However, BCGI's

very survival hinges on the present motion succeeding.  Since most of BCGI's

remaining revenues are derived from the services it performs for non-defendant

carriers, BCGI *cannot survive as a going concern* unless either the injunction is

construed not to apply to non-defendant carriers or, to the extent it does cover

them, the injunction is stayed during BCGI's appeal. *Id.*, ¶¶ 5-6.

### C. Freedom Will Not Be Harmed If BCGI's Requested Relief Is Granted

On the other hand, even if the Court were to conclude that the injunction

properly extends to reach services provided to non-defendant carriers, permitting

BCGI to continue to provide those services pending appeal would have no negative

consequences for Freedom.  Freedom offers no services and sells no products in

the prepaid wireless marketplace.  As a result, Freedom does not seek to exclude

others from the marketplace.  Instead, licensing is its business.  Indeed, the record

is clear that Freedom is willing to license its patents—and at rates much lower than

the 2.5 cents per minute that the district court imposed in the injunction (which

appears to have been based on the jury award).  Ex. 28 (Cavalieri Decl.); Ex. 29

(Johnson Decl.); Ex. 30 (Walker Affidavit).[5]

---

[5] The 2.5 cents rate was calculated based on the activities (and profits) of the
defendant carriers, including (in particular) Cingular, during a time period that is
no longer relevant. *See* Ex. 20 at 184-89, 193-94.  The rate has no evidentiary
connection to the non-defendant carriers (Nextel and Alltel).  Moreover, wireless
services, including prepaid services, are much less expensive than in the past (*see*
Ex. 31 (Mar. 30, 2005 Trial Tr.) at 5), and the non-defendant carriers began
utilizing BCGI's services later than Cingular did (*see* Ex. 32 (Nextel's Motion for
Clarification or Stay) at 3).

Here, therefore, even if Freedom prevails in this appeal and ultimately establishes (in the other pending cases) that BCGI and the non-defendant carriers jointly infringe the Freedom patents, Freedom will have suffered no harm because it can be adequately compensated by money damages. BCGI's economic situation is perilous, but Freedom has never argued (nor could it) that the non-defendant carriers—industry giants Nextel and Alltel—would not be able to satisfy whatever judgments were ultimately entered against them in those cases.

In short, therefore, this factor strongly supports a stay, especially when the lack of harm to Freedom is compared to the harm that BCGI will suffer if it were prevented from providing services to non-defendant carriers. *See E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 279 (Fed. Cir. 1987).

But even if this Court were to disagree, and conclude that Freedom needs some additional assurance that it will be compensated in the event that the non-defendants are later determined to be infringers, the Court could order BCGI to establish an escrow fund for Freedom's benefit. In that event, BCGI suggests that the Court require it to make escrow payments at a rate not greater than 0.16 cents per minute. This rate would be consistent with the license Freedom recently granted to Convergys. *See* Ex. 30, ¶ 4; Ex. 28, ¶ 3. Moreover, given the economics of the situation, this rate would be the largest payment BCGI could make without being driven into bankruptcy. *See* Ex. 27, ¶¶ 7-9.

**D.    The Public Will Be Harmed If a Stay Is Not Granted**

BCGI services approximately 10 million prepaid wireless calls per day (*see* Ex. 34 (March 9, 2005 Trial Tr.); and many subscribers who use prepaid wireless

services do so because they cannot afford, or do not have good enough credit to qualify for, a monthly billing plan. The public interest, therefore, supports a stay. If the injunction were construed to extend to services involving non-defendant carriers (and not stayed), those wireless carriers would have to seek an alternative vendor for prepaid wireless services for their customers. This would mean that millions of subscribers who are among the most vulnerable members of society would be put to the burden of changing cell plans or losing service—service that plays a crucial role in public safety. *See* Ex. 27, ¶¶ 10-13; Ex. 33 (Affidavit of S. Largent), ¶¶ 6-14.

## V.    CONCLUSION

For the foregoing reasons, BCGI respectfully requests that this Court either (1) construe the district court's injunction not to apply to non-defendant carriers, or (2) to the extent it does cover non-defendant carriers, stay the injunction pending resolution of BCGI's appeal.  Further, to preserve the status quo, BCGI asks the Court to issue a temporary stay to last only until the Court has had the opportunity to rule on this motion.

Dated:  November 14, 2005

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC  20001-4413
Telephone:  (202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
Telephone:  (650) 849-6600

*Attorneys for Defendant/Counterclaimant-*
*Appellee Boston Communications Group, Inc.*

21

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**FREEDOM WIRELESS v. BOSTON COMM**

No. 06-1020

<u>**CERTIFICATE OF INTEREST**</u>

Counsel for Appellee Boston Communications Group, Inc. certify the following:

1.    The full name of every party or amicus represented by us is:

      Boston Communications Group, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

      Not applicable.

3.    All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are:

      No publicly held company owns 10% or more of the stock of Boston Communications Group, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

      Donald R. Dunner
      Don O. Burley
      FINNEGAN, HENDERSON, FARABOW,
       GARRETT & DUNNER, L.L.P.
      901 New York Avenue, NW
      Washington, DC  20001-4413
      (202) 408-4000

1

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
(650) 849-6600

Michael B. Keating
Philip C. Swain
Vickie L. Henry
FOLEY HOAG, L.L.P.
155 Seaport Boulevard
Boston, MA  02110
(617) 832-1000

Paul J. Hayes
Patrick Sharkey
Dean Bostock
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Kirk A. Damman
LEWIS RICE & FINGERSH, LLC
500 North Broadway Suite 2000
St Louis, MO  63102
(314) 444-7783

Todd E. Thompson
Simon J. Frankel
Howard Rice Nemerovski
CANADY FALK & RABKIN, P.C.
Three Embarcadero
Seventh Floor
San Francisco, CA  94111
(415) 434-1600

2

## CERTIFICATE OF SERVICE

I hereby certify that two copies of the foregoing EMERGENCY MOTION

OF BOSTON COMMUNICATIONS GROUP, INC. TO CONSTRUE OR STAY

THE DISTRICT COURT'S INJUNCTION were served by Federal Express on this

14th day of November, 2005, on the following counsel of record:

Marshall M. Searcy III
QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017

# EXHIBIT B

06-1020, -1078, -1079

IN THE

## UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

FREEDOM WIRELESS

v.

BOSTON COMM

## REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION
## OF BOSTON COMMUNICATIONS GROUP, INC.
## TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue
Washington, DC 20001-4413
(202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA 94304-1016
(650) 849-6600

*Attorneys for Defendant/Counterclaimant-
Cross Appellant Boston Communications
Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

I.    PRELIMINARY STATEMENT .................................................... 1

II.   ARGUMENT ........................................................................... 2

      A.    BCGI's Activities With Non-Defendant Carriers Are Outside
            the Scope of This Litigation .................................................. 2

      B.    BCGI Has Substantial Arguments on Appeal ........................ 4

            1.    The Instruction on Joint Infringement Was Wrong ................... 4

            2.    The CSI Proposal Anticipates Claims 1, 27, 28, and 35 of
                  the '823 Patent and Claim 15 of the '067 Patent ...................... 6

            3.    The Evidence Fails to Support the Jury's Verdict
                  Concerning the "Periodic Validation" Claims ........................... 8

            4.    The Evidence Fails to Support the Jury's Verdict
                  Concerning the "Direct Connection" Claims............................. 9

      C.    The Balance of Harms Strongly Favors a Stay .................................... 10

III.  CONCLUSION.......................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*3D Sys., Inc. v. Aarotech Labs., Inc.,*
    160 F.3d 1373 (Fed. Cir. 1998) ............................................................................. 5

*Arbek Mfg. v. Moazzam,*
    55 F.3d 1567 (Fed. Cir. 1995) ................................................................................. 3

*Atlantic Cleaners & Dyers, Inc. v. United States,*
    286 U.S. 427 (1932).................................................................................................. 4

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
    424 F.3d 1293 (Fed. Cir. 2005) .............................................................................. 5

*In re Klopfenstein,*
    380 F.3d 1345 (Fed. Cir. 2004) .............................................................................. 8

*Int'l Med. Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc.,*
    787 F.2d 572 (Fed. Cir. 1986) ................................................................................. 4

*International Rectifier Corp v. Samsung Electronics Co.,*
    361 F.3d 1355 (2004) ............................................................................................... 2

*Seachange Int'l, Inc. v. C-Cor Inc.,*
    413 F.3d 1361 (Fed. Cir. 2005) .............................................................................. 9

*Searfoss v. Pioneer Consol. Corp.,*
    374 F.3d 1142 (Fed. Cir. 2004) .............................................................................. 9

## I.     PRELIMINARY STATEMENT

Freedom claims to have obtained a "standard-issue" injunction. Freedom's interpretation of it, however, is anything but standard and finds no support in the cases Freedom cites. A standard injunction in a patent case has a simple purpose— it prevents a defendant from continuing an activity found to have infringed, and it prevents others from acting in concert with the defendant to aid its continuation of the infringing activity.

Here, however, the activity the jury found to infringe was not the act of *any* individual defendant, but rather the "joint" activity of specific pairs of defendants (BCGI and each carrier defendant). The jury's verdict thus provided a basis for enjoining the joint activity of the named defendants. But as Freedom itself represented to the court when it sought the injunction, the verdict provided no basis either to enjoin BCGI's individual conduct or to enjoin its conduct with non-parties, which the district court expressly found to be outside the scope of this case.

Even if the verdict did justify Freedom's interpretation of the injunction, the injunction should be stayed. In opposing BCGI's request for a stay, Freedom makes numerous arguments concerning both the merits of the appeal and the harm that will occur if BCGI's motion is denied. Freedom's merit-based arguments are groundless, however, and nothing it has said counters the foundation of BCGI's motion: If this Court permits Freedom to enjoin BCGI's activities with non-defendant carriers, BCGI will likely not survive to see itself vindicated on appeal. Accordingly, this Court should grant BCGI's motion.

## II.    ARGUMENT

### A.    BCGI's Activities With Non-Defendant Carriers Are Outside the Scope of This Litigation

In excluding evidence regarding the activities of BCGI and non-defendant carriers, the district court expressly found that these activities were outside the scope of this case.  BCGI Mot. at 11.  Further, in originally requesting an injunction, Freedom represented that it was "not seeking to enjoin any conduct that the Court ruled was beyond the scope of this action, and that was not presented at trial."  Nextel Mot. at 8 (quoting Freedom's reply brief in support of its motion for injunctive relief filed in the district court).

Nevertheless, Freedom now insists that the injunction extends to the activity of non-defendant carriers, since "the injunction here is standard-issue" and uses language "taken directly from Rule 65(d)."  Freedom Resp. at 3.  But an injunction is not shielded from scrutiny simply because it quotes Rule 65(d).  In *International Rectifier Corp v. Samsung Electronics Co.*, 361 F.3d 1355 (2004), for example, this Court vacated a district court's injunction that, in using the same language of Rule 65(d), purported to reach the activities of a non-party, Ixys.  *Id.* at 1362.

Further, Freedom wrongly compares Nextel to "someone who wants to purchase an infringing product from an enjoined defendant."  Freedom Resp. at 4.  BCGI's services were never found to be infringing by themselves.  BCGI Mot. at 11.  Freedom ignores this critical distinction, however, and treats as a foregone conclusion that the combined activities of BCGI and Nextel jointly infringe its

2

patents. Freedom Resp. at 4.[1]  BCGI's and Nextel's activities, however, are the subject of a separate litigation—as are BCGI's and Alltel's activities. Accordingly, the district court's injunction should not be construed so that it would effectively short-circuit the judicial process in those cases. Nextel Mot. at 14-15.

Alternatively, Freedom proposes that this Court construe the injunction to apply to non-defendant carriers and refuse to stay it because the jury "could have found infringement under alternative theories:  (1) some claims are system claims [that] could have been infringed through beneficial use of the infringing system; and (2) certain claims were capable of being fully performed by BCGI, while others were capable of being fully performed by the carriers." Freedom Resp. at 10-11.  No reasonable reading of the jury instructions or verdict form, however, supports Freedom's "black box" verdict argument.  The district court could not have been more clear—Freedom's infringement claims were directed only to the combined activities of BCGI and the defendant carriers.  BCGI Mot. at 11. Freedom's alternative arguments, therefore, amount to nothing more than speculation on what the jury might have done if Freedom had litigated its case differently.  Accordingly, even if these arguments had merit (which they do not), they could not serve as the basis for denying BCGI's motion.  *See Int'l Med.*

---

[1] Freedom also is wrong in suggesting that Nextel and BCGI bear the burden of proving that Nextel's conduct with BCGI *does not* infringe.  Freedom Resp. at 4. *See Arbek Mfg. v. Moazzam*, 55 F.3d 1567, 1569 (Fed. Cir. 1995) ("To show contempt, the patent owner must prove by clear and convincing evidence that 'the modified device falls within the admitted or adjudicated scope of the claims and is, therefore, an infringement.'").

*Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc.*, 787 F.2d 572, 573 n.2 (Fed. Cir. 1986) ("Affirmance on an alternative ground is appropriate only when such affirmance does not depend on fact-finding.").

### B.     BCGI Has Substantial Arguments on Appeal

Even if the injunction were construed to cover the conduct of non-defendant carriers, this Court should stay it until the merits of BCGI's appeal are considered. As demonstrated in its moving brief and further explained below, the district court committed serious errors.[2]

### 1.     The Instruction on Joint Infringement Was Wrong

The theory of joint infringement that was adopted by the district court does not exist. BCGI Mot. at 13-15; Nextel Mot. at 12-14. In arguing otherwise, Freedom focuses on § 271(a)'s use of the term "whoever." Specifically, Freedom argues that since § 101 uses the word "whoever" in identifying who may obtain a patent and "joint patenting in the form of joint inventorship is plainly allowed," "[b]inding principles of statutory construction require the same interpretation in Section 271." Freedom Resp. at 6-7. Notwithstanding Freedom's assertion, there is no "binding" rule that "requires" the same word to mean the same thing in different statutory provisions. *See, e.g., Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("It is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory

---

[2] Although Freedom argues that to obtain a stay, BCGI "must establish by a 'strong showing'" that it will prevail (Freedom Resp. at 5), that is not correct. Where, as here, the moving party will be severely harmed without a stay, the moving party need only show that it can raise a "substantial issue." BCGI Mot. at 12.

construction which precludes the courts from giving to the word the meaning which the legislature intended it should have in each instance."). To the contrary, given the very different policies underlying inventorship and infringement, there is no reason at all to conclude that "whoever" should be construed the same way for § 271 as it is for § 101. *Cf. 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 n.4 (Fed. Cir. 1998) (declining to "import the authority construing the 'on sale' bar of § 102(b) into the 'offer to sell' provision of § 271(a)" because of different policies underlying the two provisions).

Freedom's attempt to find support for its joint infringement theory in *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005) (Freedom Resp. at 10-11 n.9), also falls flat. *Cross Medical* dealt with a claim to "[a] fixation device" having "an interface" that was "joined to [a] bone." *Cross Medical*, 424 F.3d at 1305. Although the device sold by Medtronic was not yet joined to a bone (that was done by the surgeon), the plaintiff insisted that Medtronic was a direct infringer because it directed surgeons to make an infringing device by joining Medtronic's product to a bone. *Id.* at 1311. The Court rejected that theory, however, observing that the surgeons were not Medtronic's agents. *Id.* Thus, the only lesson relevant to this case that can be drawn from *Cross Medical* is that, absent an agency (or control) relationship, one party cannot be responsible as a direct infringer based on the conduct of another party. BCGI Mot. at 13-15.

Finally, Freedom is incorrect when it argues that "the facts here compelled a finding of joint infringement even under BCGI's severe standard." Freedom Resp. at 9. The activities identified by Freedom (contracts, coordination, and frequent

communication) do not constitute "control" in the legal sense, and whether or not they might provide a basis for liability under a lesser standard requiring knowledge and intent (*see* BCGI Mot. at 14-15) is irrelevant. The jury was not instructed under either of these standards, but was instead told that it had to find only that the parties "worked together." That ambiguous instruction failed to adequately guide the jury, and, as noted previously, speculating what the jury might have done if instructed differently is impermissible. *See* pages 3-4 *supra*.

### 2. The CSI Proposal Anticipates Claims 1, 27, 28, and 35 of the '823 Patent and Claim 15 of the '067 Patent

In its moving brief, BCGI demonstrated that no reasonable jury could have concluded that claims 1, 27, 28, and 35 of the '823 patent and claim 15 of the '067 patent were valid over the CSI proposal. BCGI Mot. at 16-17. Freedom makes three arguments in response (Freedom Resp. at 12-14), but none is convincing.

First, Freedom argues that the CSI proposal "says nothing about how pre-paid service would be implemented in the CSI system, has no pre-paid accounting system, no mechanism for terminating calls when the balance runs out, and no indication how pre-paid balances would be handled or stored." *Id.* at 13. None of these details, however, is recited in any of the claims subject to BCGI's arguments on this issue. BCGI Mot. at 16-17.

Second, Freedom criticizes BCGI's expert (Professor Wicker) because he allegedly showed only that the "concepts" or "ideas" of the claims were found in the CSI proposal. Freedom Resp. at 14. That, however, is a gross distortion of Professor Wicker's testimony. In actuality, Professor Wicker specifically showed

6

where the claim elements that were required by the district court's construction were found in the CSI Proposal (BCGI Mot. at 9-10)—and his analysis included a traditional limitation-by-limitation comparison to claim 15 of the '067 patent. Ex. 35 (Apr. 12, 2005, Trial Tr.) at 101-06. All the other claims at issue (claims 1, 27, 28, and 35 of the '823 patent) recite the same (or fewer) elements, except that they deal with calls the prepaid subscriber receives ("incoming calls") rather than calls the subscriber makes ("outgoing calls"), and claims 1, 27, and 28 further recite a very basic subscriber verification step. And Professor Wicker testified where these additional features were taught in the CSI proposal. BCGI Mot. at 9-10; Ex. 35 at 108-10.

Thus, contrary to Freedom's argument, Professor Wicker testified where all the elements of the five claims now at issue were found in the CSI proposal. Because Freedom asserted 32 claims and Professor Wicker analyzed several prior art references, he used a short-hand method (his "three basic ideas" and color-coded claim charts) to summarize his conclusions rather than testify on a limitation-by-limitation basis concerning each asserted claim. But under the circumstances, Professor Wicker's approach was eminently reasonable, and it in any event did not affect the testimony he gave regarding the five claims now at issue. Indeed, while Freedom attacks Professor Wicker's *methodology*, it points to no limitation of any of these five claims that is missing from the CSI proposal. On the contrary, Freedom mentions only limitations from *other* claims, i.e., the "claims that recite particular implementations and methods for delivering pre-paid operation." Freedom Resp. at 13.

7

Finally, Freedom argues that "the jury could have determined that the CSI documents were not sufficiently accessible to be printed publications." Freedom Resp. at 14. Not true. Professor Wicker testified that the proceeding, which was open to the public, was highly publicized at the time, and that he easily obtained the CSI materials from the public records of the CPUC using only the docket number. Ex. 35 at 43-45. Since these facts were uncontested, the question of whether the CSI proposal was a "printed publication" is a question of law. *See In re Klopfenstein*, 380 F.3d 1345, 1347 (Fed. Cir. 2004). Moreover, the facts compel the conclusion that the CSI proposal was "publicly accessible," which is the relevant test for a printed publication. *Id.* at 1348 ("the key inquiry is whether or not a reference has been made 'publicly accessible'").

### 3. The Evidence Fails to Support the Jury's Verdict Concerning the "Periodic Validation" Claims

BCGI's alarm-based method for call accounting is indistinguishable from the prior art D'Urso method that was identified, criticized, and distinguished by Freedom in its patent and during prosecution. BCGI Mot. at 5-9, 16. Freedom does not deny this. Instead, Freedom argues that it never disclaimed D'Urso's alarm-based method. This same argument, however, was correctly rejected by the district court, which properly required periodic validation in every claim that recited some call-accounting method. BCGI Mot. at 6.

Freedom also argues that it presented sufficient evidence of infringement for these claims. Freedom Resp. at 15-16. The evidence cited by Freedom, however, confirms that BCGI's accounting method relied on the same kind of simple,

8

computer-based alarm used in D'Urso and disclaimed by Freedom. Therefore, the infringement verdict for these claims cannot stand. BCGI Mot. at 16.

### 4.    The Evidence Fails to Support the Jury's Verdict Concerning the "Direct Connection" Claims

While Freedom recognizes that the district court concluded that it had disclaimed coverage of anything other than a prepaid billing system that directly connected calls to the LEC, Freedom argues that the district court erred in this regard. Freedom Resp. at 16-17. For all the reasons BCGI stated previously, however, the district court should have granted JMOL to BCGI on the 17 claims that the court properly construed to require a direct connection. BCGI Mot. at 5, 15-16. Moreover, there is no merit to Freedom's argument that the "all elements" rule does not apply here because "'direct connection' is not an element of any claim, but is instead a feature the district court incorporated" into its claim construction. Freedom Resp. at 17. Indeed, that argument is refuted by the two cases cited in BCGI's brief, *Seachange Int'l, Inc. v. C-Cor Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005), and *Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004), where the "all elements" rule was applied in each case to limitations that did not expressly appear in the claim, but were instead part of the Court's construction.

Finally, even if Freedom were right, the judgment still could not be sustained. The 17 claims at issue would not be infringed in any event, since the periodic validation limitation of each of these claims would remain unmet. BCGI Mot. at 5-7, 16.

9

### C.     The Balance of Harms Strongly Favors a Stay

Freedom does not deny that the district court's injunction, if construed to cover non-defendant carriers, would put BCGI out of business.  Instead, Freedom argues that "[t]he verdicts themselves establish irreparable harm to Freedom." Freedom Resp. at 18.   Both of the cases Freedom cites in support of this proposition, however, concern the propriety of injunctions *after* this Court has ruled on the merits of the underlying appeal.  At this stage—and in a situation where the balance of harms so clearly favors maintaining the status quo pending appeal—these cases have little if any relevance.  BCGI Mot. at 18-19.

Freedom also argues that it will be harmed if BCGI goes bankrupt and thereby "succeed[s] in never having to pay Freedom."  Freedom Resp. 19.   In offering this unusual definition of "success," however, Freedom ignores that the carrier defendants are jointly liable for the damages awards in this case and there is no evidence (or even suggestion) that they cannot pay the full amount of the judgment.   Indeed, Cingular and BCGI have already posted four bonds totaling over $140 million (representing 110% of the original judgment plus $500).  In short, therefore, Freedom's concerns about non-payment are fictional, and it will suffer no harm if the injunction is stayed pending resolution of BCGI's appeal.

## III.  CONCLUSION

For the reasons set forth in this and its moving brief, BCGI respectfully requests that its motion be granted.

Dated:  November 28, 2005

*Donald R. Dunner/dob*

Donald R. Dunner
Don O. Burley
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC  20001-4413
Telephone:  (202) 408-4000

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
700 Hansen Way
Palo Alto, CA  94304-1016
Telephone:  (650) 849-6600

*Attorneys for Defendant/Counterclaimant-
Cross Appellant Boston Communications
Group, Inc.*

11

## CERTIFICATE OF SERVICE

I hereby certify that two copies of the foregoing UNOPPOSED MOTION OF BOSTON COMMUNICATIONS GROUP, INC. FOR LEAVE TO FILE A REPLY BRIEF IN SUPPORT OF ITS EMERGENCY MOTION TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION, the attached proposed ORDER, and the REPLY BRIEF IN SUPPORT OF EMERGENCY MOTION OF BOSTON COMMUNICATIONS GROUP, INC. TO CONSTRUE OR STAY THE DISTRICT COURT'S INJUNCTION were served by Federal Express (with courtesy copies sent by facsimile or email) on this 28th day of November, 2005, on the following counsel of record:

> Marshall M. Searcy III
> QUINN EMANUEL URQUHART
>   OLIVER & HEDGES, LLP
> 865 South Figueroa Street, 10th Floor
> Los Angeles, CA  90017

# EXHIBIT C

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

FREEDOM WIRELESS v BOSTON COMM, 06-1210

---

Motion to Intervene for Limited Purpose

---

Richard McMillan, Jr.
Clifton S. Elgarten
Michael J. Songer
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile:  (202) 628-5116

*Attorneys for Putative Intervenors*
*Nextel Communications, Inc. and*
*Nextel Operations, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT


FREEDOM WIRELESS V. BOSTON COMM

No. 06-1020

CERTIFICATE OF INTEREST

Counsel for Intervenors Nextel Communications, Inc. and Nextel Operations, Inc. Nextel Communications, Inc. and Nextel Operations, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is: Nextel Communications, Inc. and Nextel Operations, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  NA

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Nextel Communications, Inc., Nextel Finance Corp., and Sprint Nextel Corp.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Crowell & Moring LLP:  Richard McMillan, Jr., Clifton S. Elgarten, and Michael J. Songer.

Burns & Levinson:  Dennis J. Kelly and Victoria L. Walton.


*Richard McMillan*

November 14, 2005                 Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone No.:  (202) 624-2500
Facsimile No.:  (202) 628-8844
e-mail:  rmcmillan@crowell.com

# TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

ARGUMENT ..................................................................................... 5

    I.     INTERVENTION OF RIGHT SHOULD BE GRANTED ................. 5

        A.   Nextel Has Moved to Intervene in a Timely
            Manner ................................................................................. 6

        B.   Nextel Possesses Legally Protectable Interests ....................... 12

        C.   Nextel's Interests Will be Substantially Impaired .................... 14

        D.   Nextel's Interest is Not Capable of Being ................................ 15

    II.    PERMISSIVE INTERVENTION SHOULD BE
        GRANTED .......................................................................... 18

CONCLUSION ................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Additive Controls & Measurements Sys., Inc. v. Flowdata, Inc.,*
   96 F.3d 1390 (Fed. Cir. 1996) ........................................................................17

*Conservation Law Found. of New England, Inc. v. Mosbacher,*
   966 F.2d 39 (1st Cir. 1992) ...............................................................................6

*Cotter v. Mass. Ass'n of Minority Law Enforcement Officers,*
   219 F.3d 31(1st Cir. 2000) ..............................................................................16

*Cruz v. County of DuPage,*
   1997 WL 370194 (N.D. Ill. 1997)....................................................................13

*Fiandaca v. Cunningham,*
   827 F.2d 825 (1st Cir. 1987) .............................................................................7

*Haworth, Inc. v. Steelcase, Inc.,*
   12 F.3d 1090 (Fed. Cir. 1993) ...........................................................................5

*In re Bushkin Assoc., Inc.,*
   864 F.2d 241 (1st Cir. 1989) ...........................................................................15

*In re Thompson,*
   965 F.2d 1136 (1st Cir. 1992) .........................................................................18

*In re Yarn Processing Patent Validity Litig.,*
   530 F.2d 83 (5th Cir. 1976) ............................................................................13

*Jansen v. City of Cincinnati,*
   904 F.2d 336 (6th Cir. 1990)...........................................................................11

*Mangual v. Rotger-Sabat,*
   317 F.3d 45 (1st Cir. 2003) ...............................................................................5

*Michael H. v. Gerald D.,*
   491 U.S. 110 (1989) ........................................................................................17

*Southwest Ctr. for Biological Diversity v. Berg,*
    268 F.3d 810 (9th Cir. 2001) ............................................................................ 12

*Trbovich v. United Mine Workers,*
    404 U.S. 528 (1972) ...................................................................................... 15

*UAW v. Scofield,*
    382 U.S. 205 (1965) ................................................................................... 5, 17

*Utahns for Better Transp. v. U.S. Dept. of Transp.,*
    295 F.3d 1111 (10th Cir. 2002) ...................................................................... 16

## Other Authorities

18A Wright, Miller, & Cooper, Federal Practice and Procedure:
    Jurisdiction 2d § 4449 (2002) ........................................................................ 17

## Rules

Fed. R. Civ. P. 24(b) ............................................................................................ 18

## INTRODUCTION

By this motion, Nextel Communications, Inc. and Nextel Operations, Inc. ("Nextel"),[1] a non-party in the case below, seeks to intervene solely to address two issues that arose as the case in the district court was concluding.

*First*, Nextel seeks to clarify or limit the scope of the injunction that the district court issued so that it will not extend to Nextel, a non-party. *See* Ex. A (Injunction Order). In the district court, Plaintiff-Appellant Freedom Wireless, Inc. ("Freedom") pursued a theory of "joint infringement" that depended on combined actions of multiple parties to make out an infringement. Thus, actions of principal Defendant-Appellee Boston Communications Group, Inc. ("BCGI") were not separately challenged as infringing in and of themselves. Rather, it was only the "joint" actions of several "pairs" of defendants that were found infringing. On four separate verdict sheets, the jury found that the joint actions of BCGI and (1) Cingular Wireless, LLC, (2) AT&T Wireless PCS, (3) CMT Partners, and (4) Western Wireless Corp., infringed the patents. *E.g.*, Ex. B (Jury Verdict).

---

[1]    Nextel is a national telecommunications company which recently merged with a subsidiary of Sprint Corporation to form Sprint Nextel Corporation ("Sprint Nextel"), the third-largest wireless service provider in the United States. Nextel Communications, Inc. is a subsidiary of Sprint Nextel; Nextel Operations, Inc. is an indirect wholly-owned subsidiary of Nextel Communications, Inc. and operates the wireless network here in issue.

Nextel was *not* part of these proceedings.  In fact, Freedom's claims of joint

infringement involving BCGI and Nextel – allegedly arising from Nextel's

contract with BCGI for services in connection with billing for prepaid wireless

phone services – have become the subject of a separate lawsuit brought by

Freedom earlier this year.  *See Freedom Wireless, Inc. v. Boston Communications*

*Group, Inc.*, No. 05-11061-EFH (D. Mass. filed May 20, 2005) ("Nextel

Litigation"); *see also Freedom Wireless, Inc.  v. Boston Communications Group,*

*Inc.*, No. 05-11062-EFH (D. Mass. filed May 20, 2005) ("Alltel Litigation").

Plaintiff Freedom nevertheless claims that the injunction in this case already

binds Nextel.  When Freedom's construction of the trial court's joint infringement

injunction was challenged below, the trial court rejected the request to clarify,

without opinion.  Nextel seeks to intervene here to confine the trial court's

injunction to its proper limits and to stay the injunction as to Nextel pending the

conclusion of the appeal.  The motion to stay is being filed concurrent with this

motion to intervene.

*Second,* Nextel seeks to intervene to address a collateral matter, namely, the

disqualification of one of Freedom's principal law firms from their continued

participation in this case.  Throughout the proceedings below, Freedom was

represented by a firm that in a number of other substantial and ongoing matters

- 2 -

also represents Nextel.[2]  Throughout these proceedings, that firm apparently sought

to walk a careful line on its ethical duties – pursuing only joint infringement

theories that did *not* involve Nextel – but it abruptly crossed that line when it

pursued an interpretation of the court's injunction that would extend the injunction

to the relationship between BCGI and Nextel.[3]

Unless disqualified, that firm is apparently prepared to continue to pursue

that theory on this appeal.  That argument has put the firm in a position directly

adverse to a current client, Nextel.  Nextel seeks to intervene to seek

disqualification.

As shown below, all of the standards for intervention on these limited issues

are met.  When these issues arose in the district court with issuance of the

Injunction Order, Nextel immediately moved to intervene for the limited purpose

of clarifying or seeking other appropriate relief relating to the court's injunction.

---

[2]    Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel") has
represented Nextel since 1993, has received in the past several years millions of
dollars from Nextel for its legal work, and continues to represent Nextel in a wide
variety of matters.  Quinn Emanuel issued a press release the day following release
of the district court's injunction order, suggesting that the Injunction Order would
affect companies such as Nextel.

[3]    The firm has exacerbated this conflict by recently filing the Alltel Litigation,
simultaneous with and identical to the Nextel Litigation, in the same court and
under circumstances where consolidated or coordinated proceedings will inevitably
put the firm in further conflict with Nextel.

Ex. C (Oct. 25, 2005 Nextel's Motion and Memorandum to Intervene for Limited Purpose). On November 9, 2005, the district court denied Nextel's motion to intervene, as well as BCGI's motion to stay the injunction. Nextel has filed a notice of appeal from the denial of that motion to intervene.[4]

Nextel is filing simultaneously herewith its motion to stay. Nextel also attaches hereto the motion, supporting memorandum, and declarations that it sought to file as intervenor in the district court.[5] If intervention is permitted, Nextel will file a further brief addressing the limited issues for which it seeks intervention, in accordance with the briefing schedule to be imposed by this Court. Nextel has discussed this motion with the other parties to this appeal. Freedom objects and intends to respond.

---

[4]    Nextel believes that the most expeditious and efficient means of addressing these issues is by intervening in this appeal. Although it has separately appealed from the trial court's denial of its motion to intervene, it is relatively clear that it would be redundant to press both appeals separately. Thus, this Court may choose to consolidate the appeals or take some other action to allow the issues to be addressed most efficiently.

[5]    See Ex. C; Ex. D (Declaration of Phillip Cooke); Ex. E (Declaration of Terry Koehler); Ex. F (Declaration of Jamia Williams); Ex. G (Declaration of Brian Koide).

## ARGUMENT

Nextel moves to intervene both as of right and permissively. Under either standard, intervention is both warranted and proper.

## I.    INTERVENTION OF RIGHT SHOULD BE GRANTED

There is no separate rule for intervention in the Federal Rules of Appellate Procedure. Rather, the Supreme Court has held that the policy behind Rule 24 of the Federal Rules of Civil Procedure governs intervention at the appellate level. *UAW v. Scofield*, 382 U.S. 205, 217 n.10 (1965). Rule 24(a) of the Federal Rules of Civil Procedure sets forth the following standard for intervention as of right:

> Upon timely application anyone shall be permitted to intervene in an action . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a).

This Court applies the law of the regional circuit to procedural matters, including motions to intervene. *Haworth, Inc. v. Steelcase, Inc.*, 12 F.3d 1090, 1092 (Fed. Cir. 1993). The First Circuit, from which this appeal arises, permits appellate intervention. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 62 (1st Cir. 2003) ("[W]e have the discretion to permit intervenors at the appellate level, and we

choose to do so here."). The First Circuit has established that a party seeking to

intervene as of right under Rule 24(a)(2) must satisfy four elements:

1.   The application must be timely . . .;

2.   The applicant must claim an interest relating to the property or transaction which is the subject of the action;

3.   Disposition of the action may, as a practical matter, impair or impede that applicant's ability to protect the interest; and

4.   The applicant must show that the interest will not be adequately represented by existing parties.

*Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 41

(1st Cir. 1992). Because Nextel's application satisfies each of the four elements,

Nextel is entitled to intervention as of right, and the Court should grant its motion.

A.   **Nextel Has Moved to Intervene in a Timely Manner**

The Injunction Order was not issued until post-verdict, and Nextel has

moved in timely fashion, both below and in this Court, following receipt of that

Order. While post-trial requests to intervene are unusual, the First Circuit has

specifically acknowledged that circumstances may well warrant such intervention:

> It is true that a motion to intervene must be filed in a timely fashion, and that in this case, intervention was sought only after the conclusion of the trial. However, the point to which a suit has progressed, while relevant, is not the dispositive factor in determining timeliness. Rather, "[t]imeliness is to be determined from all the circumstances." Furthermore, several courts have held that the standards of timeliness for a Rule 24(a) motion are less strict than for a Rule 24(b) motion because

- 6 -

greater interests are at stake in the former case.

*Fiandaca v. Cunningham*, 827 F.2d 825, 833-34 (1st Cir. 1987) (internal citations omitted) (granting motion to intervene -- after conclusion of trial – where applicants moved to intervene "soon after learning that their interests may be affected...").

In considering "all the circumstances" relating to timeliness, First Circuit courts typically consider four factors:

> (1)   the length of time the applicants knew, or reasonably should have known, of their interest before they petitioned to intervene;
>
> (2)   the prejudice to existing parties due to applicants' failure to petition for intervention promptly;
>
> (3)   the prejudice that applicants would suffer if they were not allowed to intervene; and
>
> (4)   any unusual circumstances militating either for or against intervention.

*Id.* at 834 (internal citations omitted).

Before the filing of the Injunction Order there was no cause for Nextel to intervene in the litigation below. The district court let Freedom pursue only the "joint infringement" claims involving the named defendants, and the court repeatedly and consistently denied any attempts by Freedom to expand upon the relatively narrow focus of the litigation. The so-called joint infringement claims pursued by Freedom rested entirely on the theory that the *combined* actions of

BCGI and at least one other party – more precisely, BCGI and each of the wireless

defendants – infringed Freedom's patents.

Further, in a letter dated January 2005, Freedom itself made clear to Nextel

that Nextel's interests were not implicated this case:

> As you may know, Freedom Wireless has patent
> infringement litigation pending against Boston
> Communications Group, Inc. and a number of wireless
> carriers. <u>Freedom Wireless, Inc. v. Boston
> Communications Group, Inc. et al.</u>, Case No. 00-CV-
> 12234-EFH, United States District Court of
> Massachusetts (the "BCGI Suit"). In the BCGI Suit,
> Freedom Wireless is seeking damages for
> infringement . . . *by the defendants* in their provision of
> prepaid wireless communications services, as well as an
> injunction prohibiting further infringing activity.
>
>         * * *
>
> Based on information that we have obtained that Nextel
> Communications is a vendor of prepaid wireless services,
> it appears that Nextel Communications may be utilizing
> technology covered by one or more of the Freedom
> Wireless Patents . . .
>
>         * * *
>
> Freedom Wireless has no interest in *further litigation* at
> this time, and understands that many companies would
> prefer to wait for the outcome of the BCGI Suit before
> making any determination as to the need for a license.

Ex. H (Jan. 25, 2005 Letter from Bramson to Donahue) at 1-2 (emphasis added).

Nextel also reasonably believed that Quinn Emanuel, its regular counsel, would act

as counsel to Freedom only in an ethical manner and not adverse to Nextel. Thus,

Nextel had no reason to intervene in this case before trial.

The district court, for its part, also declined to allow Freedom to inject any

- 8 -

issues concerning Nextel into the case. To the contrary, it ruled that if Freedom wished to pursue a claim of joint infringement resulting from the combined actions of BCGI and any other wireless carrier, it would have to file a follow-on action. The Court was quite specific in this regard, holding that the case before it "is not an adjudication on the merits of any claims arising from conduct involving non-defendant carriers . . . Freedom may pursue claims arising from conduct involving non-defendant carriers in a separate action." Ex. I (Apr. 27, 2005 Order) at 1-2. Freedom, in fact, did so, filing a separate action against BCGI and Nextel on May 20, 2005. *See* Nextel Litigation, No. 05-11061-EFH (D. Mass. filed May 20, 2005); *see also* Alltel Litigation, No. 05-11062-EFH (D. Mass. filed May 20, 2005). Nextel had every reason to believe that its rights would be determined in that action, not through the back door (by way of an overly-expansive injunction), in this one.

The Injunction Order, although dated October 12, 2005, was not entered until October 17, 2005, at which time Nextel became aware of the Order. Ex. D ¶ 4. However, when it sought this injunction, Freedom – in its briefs to the district court – had assured the district court that the scope of its proposed injunction would *not* extend beyond the "joint infringements" at issue in this case, and would only address the actions of defendants found to infringe Freedom's patents:

> Freedom is not seeking to enjoin any conduct that the
> Court ruled was beyond the scope of this action, and that

was not presented at trial. Freedom is only seeking to
enjoin the conduct that was found to infringe Freedom's
patents-in-suit . . . Freedom is only seeking to enjoin
*defendants* from performing the same activities with the
same implementations *that were actually found to
infringe* Freedom's patents-in-suit.

Ex. J (Freedom's Reply Brief in Further Support of its Motion for Injunctive

Relief) at 6 (emphasis added).

However, shortly after issuance of the injunction, Quinn Emanuel issued a

press release asserting a contrary view:

"The injunction prohibits any of the defendants from
making, using, or selling prepaid wireless services based
on the systems found to infringe, either by themselves or
jointly *with any other companies*," said Bill Price, lead
trial lawyer for the plaintiff and chair of Quinn Emanuel
Urquhart Oliver & Hedges LLP's trial practice. It thus
prohibits BCGI *and its current carrier customers,
including Alltel and Cincinnati Bell, Inc. (CBB), which
were named in a recent patent infringement lawsuit by
Freedom Wireless, from selling prepaid wireless services
using the infringing BCGI systems.*[6]

Because the allegations of infringement in the Complaints filed by Freedom

against Nextel, Alltel, Cincinnati Bell, and others are substantially identical,

---

[6]     Ex. K (Press Release) at 1 (emphasis added). While not mentioning Nextel
by name, the press release specifically identifies other carriers, including Alltel
Corp. ("Alltel") and Cincinnati Bell, Inc. ("Cincinnati Bell"), which like Nextel are
not defendants in the litigation below. Like Nextel, Alltel and Cincinnati Bell have
also been sued in a follow-on litigation which is pending before this Court. *See*
Alltel Litigation, No. 05-11062-EFH (D. Mass. filed May 20, 2005).

counsel for Nextel promptly asked Quinn Emanuel to confirm that it had not

sought or obtained on behalf of Freedom an injunction that adversely affected the

interests of Nextel.[7]   Quinn Emanuel promptly responded, acknowledging that

Nextel was a longtime and substantial client of Quinn Emanuel, but claiming that

the firm had not analyzed whether the injunction reaches Nextel.[8]

    Nextel immediately filed a timely motion to intervene at the district court

level on October 25, 2005, within approximately a week of first learning of the

injunction (on October 17) and of becoming aware of the press release (on October

18).

    In sum, Nextel acted promptly.  There can be no credible claim of "delay."

Moreover, because this intervention is directed at the scope of the injunction – and

issues which arose after trial -- there can be no plausible claim of prejudice.  *See*

*Jansen v. City of Cincinnati*, 904 F.2d 336, 341 (6th Cir. 1990) ("Approximately

two weeks elapsed between the time in which the proposed intervenors learned of

their need to intervene and when they filed their motion to intervene.  Certainly,

this short period does not support a finding of undue delay.")  In this Court, Nextel

---

[7]    Ex. L (Oct. 19, 2005 Letter from McMillan to Urquhart).

[8]    Ex. M (Oct. 19, 2005 Letter from Urquhart to McMillan); *see also* Ex. N
(Quinn Emanuel Representative Clients) (stating that Quinn Emanuel represents
Nextel in intellectual property litigation, antitrust, class action, and appellate
matters).

would now be intervening at a time when all parties are first briefing and arguing the issues, according to the schedule to be set by this Court.

Under the circumstances, Nextel has clearly moved in a timely fashion.

**B.    Nextel Possesses Legally Protectable Interests**
**Relating to the Injunction and Disqualification**

The First Circuit has recognized that a protectable interest requires that "the intervenor's claims must bear a 'sufficiently close relationship' to the dispute between the original litigants." *Mosbacher*, 966 F.2d at 42.

Nextel has two direct interests in this case, both of which are recognized as proper bases for intervention as of right. First, Nextel has a direct interest in the injunction to the extent that it would be construed to bar the continued relationship of BCGI and Nextel. Nextel has relied on BCGI's services to run its prepaid wireless phone service for several years under the brand "Boost Mobile." Ex. D ¶¶ 5-6. Nextel uses BCGI's services for all of the prepaid wireless phone calls made by its Boost Mobile customers in the United States. *Id.* ¶ 6. Prohibiting Nextel from utilizing BCGI services within the period specified in the injunction would seriously impact Nextel's ability to offer prepaid wireless phone calls. *Id.* Accordingly, Nextel has a significant protectable interest. *See Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001) ("An applicant demonstrates a 'significantly protectable interest' when 'the injunctive relief

sought by the plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests.'").

Second, Nextel has a direct interest in the disqualification issue. The relationship between a client and his or her law firm is fiduciary in nature; the client has a direct interest in insuring that its law firm not take positions adverse to the client in violation of the ethical principles that control that relationship.[9] The nature of the interest being protected virtually compels Nextel to intervene in order to protect that interest, now that the actions of Quinn Emanuel directly adverse to Nextel have been exposed. There is no other effective way to protect the underlying interest other than through intervention and a motion to disqualify.[10] Several courts have recognized that a party may intervene as of right to pursue disqualification issues. *See In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir. 1976) (noting that non-party "could have intervened as of right under Rule 24(a) of the Federal Rules of Civil Procedure, and it could have pressed for the disqualification of" attorney); *Cruz v. County of DuPage*, 1997 WL 370194,

---

[9] Nextel believes Quinn Emanuel must also separately be disqualified as counsel in the Alltel Litigation, an issue that will be the subject of a separate motion in the follow-on litigation in the lower courts.

[10] The issue is especially appropriate for intervention here because it is entirely collateral to the merits of the underlying dispute, and thus cannot be addressed by the parties.

at *4-6 (N.D. Ill. 1997) (allowing non-party to intervene for purposes of ruling on non-party's motion to disqualify counsel due to conflict of interest under Rule 1.7 of the Rules of Professional Conduct).

### C.    Nextel's Interests Will be Substantially Impaired

Once it is determined that an applicant for intervention of right has a legally protectable interest, the First Circuit looks to see whether that interest will be impaired by the action. *Mosbacher*, 966 F.2d at 41. Both of Nextel's two legally protectable interests will be substantially impaired unless Nextel is allowed to intervene in the action.

First, Nextel obviously has an interest in lifting or limiting an injunction that is currently restricting its business activities. Freedom's interpretation of the injunction – apparently acquiesced in by the district court -- that it applies to Nextel's relationship with BCGI, impacts Nextel's ability to operate its prepaid wireless phone service. *See* Ex. D ¶ 6. Transitioning to another comparable service provider cannot reasonably be accomplished properly, with appropriate testing and controls, within the injunction's 90-day time frame, but rather will likely take several months longer. *Id.* ¶ 7. Moreover, in an industry where reliability of service is paramount, shutting down Nextel's prepaid wireless phone service – even for a few hours, let alone a few months – would irreparably harm the Boost Mobile brand and jeopardize Nextel's prepaid wireless client base. *Id.* ¶

- 14 -

8. Thus, Nextel's direct interest in the injunction bears "a 'sufficiently close relationship' to the dispute between the original litigants," *Mosbacher*, 966 F.2d at 42, and is sufficient to sustain a right to intervene under Rule 24(a)(2).

Second, Nextel has a profound interest in the disqualification issue since Nextel's right to the loyalty of its counsel is being violated on an ongoing basis. By obtaining an injunction that purports to apply to all BCGI customers, Quinn Emanuel has acted in a manner directly adverse to a current client. Such a conflict of interest injures not only Nextel, but the integrity of the judicial system as a whole. *In re Bushkin Assoc., Inc.*, 864 F.2d 241, 246 (1st Cir. 1989) (attorney disqualification can be necessary "to protect the integrity of the judicial process, enforce its rules against transgressors, and maintain public confidence in the legal profession."). This ethical violation will go unchallenged if Nextel's motion to intervene is not granted.

### D. Nextel's Interest is Not Capable of Being Adequately Represented by the Current Parties

Under First Circuit law, "[a]n intervenor need only show that representation *may be* inadequate, not that it is inadequate." *Mosbacher*, 966 F.2d at 44 (emphasis added) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). Here, the existing parties are incapable of adequately representing Nextel.

First, Nextel is concerned only with the extension of the injunction in this case to itself, a non-party. None of the other wireless carrier defendants (*e.g.*,

- 15 -

Cingular) has any interest in limiting the scope of the injunction in this fashion. To the contrary, if the injunction reaches them, they should be all too happy to have it reach a competitor, Nextel, as well, notwithstanding that Nextel has not been found to have engaged in any wrongdoing.

As for BCGI, its interests in this appeal are much broader. BCGI will undoubtedly be devoting more efforts on this appeal to the infringement and invalidity issues rather than the precise scope of the injunction. Moreover, there is no assurance that BCGI will act in Nextel's best interest, whether in the short or long-term future. Nextel and BCGI are separate businesses, each interested in their own financial well-being. While the financial interests of BCGI and Nextel might coincide on issues concerning the scope of the injunction, they might not. BCGI could, at any time, agree to settle, rather than fight. Adequate representation cannot be present where such potential for a divergence of interest exists. *See Cotter v. Mass. Ass'n of Minority Law Enforcement Officers*, 219 F.3d 31, 36 (1st Cir. 2000) ("[T]here is enough likelihood of conflict or divergence between the intervention applicants and the named defendants to overcome the final adequate-representation proviso."); *accord Utahns for Better Transp. v. U.S. Dept. of Transp.*, 295 F.3d 1111, 1117 (10th Cir. 2002) ("'The possibility that the interests of the applicant and the parties may diverge 'need not be great' in order to satisfy this minimal burden [of inadequate representation].'")

- 16 -

Second, no party can adequately represent Nextel's interest in vindicating its own constitutional rights – namely, the district court's entry of an injunction against a non-party, Nextel, which was not present before the court. Our judicial system is founded upon a "deep-rooted historic tradition that everyone should have his own day in court." 18A Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4449, p. 346 (2002). Enjoining conduct by a non-party such as Nextel violates the "general rule that a court may not enter an injunction against a person who has not been made a party to the case before it." *Additive Controls & Measurements Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996). This constitutional right is intensely personal. *Michael H. v. Gerald D.*, 491 U.S. 110, 147 (1989) (Brennan, J., dissenting) ("procedural due process is, by and large, an individual guarantee"). As such, Nextel is the proper party to present the constitutional issues concerning the scope of the court's injunction.

Third, as noted above, no party presently involved in the litigation can adequately represent Nextel for purposes of its motion for disqualification of Quinn Emanuel as counsel for Freedom. This issue too can be vindicated only by Nextel and is unlikely to be pursued (even assuming that it could be pursued) by any other party.

## II.    PERMISSIVE INTERVENTION SHOULD BE GRANTED

Should the Court determine that the criteria for intervention as of right are not met, the Court -- in the alternative -- should allow Nextel to intervene under the principle of permissive intervention. As noted above with respect to intervention as of right, the Supreme Court has held that the policy of Federal Rule of Civil Procedure 24 governs appellate intervention. *UAW v. Scofield*, 382 U.S. at 217 n.10. Rule 24(b) of the Federal Rules of Civil Procedure sets forth the standard for permissive intervention:

> Upon timely application anyone may be permitted to intervene in an action . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b). The First Circuit requires a party seeking to intervene permissively under Rule 24(b) to satisfy three elements:

> (1)    "[T]he applicant's claim or defense and the main action have a question of law or fact in common,"
>
> (2)    "the applicant's interests are not adequately represented by an existing party, *and*"
>
> (3)    "intervention would not result in undue delay or prejudice to the original parties."

*In re Thompson*, 965 F.2d 1136, 1142 n.10 (1st Cir. 1992) (emphasis in original).

Nextel meets all three requirements.

- 18 -

First, Nextel seeks intervention for purposes of staying the Injunction Order, clarifying its scope, and disqualifying Quinn Emanuel. The scope of the injunction implicates each of these issues – and is indeed intertwined and central to BCGI's appeal – and the issues of intervention thus share important issues of law and fact with the remaining issues before this Court.

Second, as described above, Nextel's interests are not adequately represented by any other party.

Finally, as also described above, Nextel's intervention will not unduly delay or prejudice any other parties.

Therefore, even if mandatory intervention is not found to be appropriate, permissive intervention should be allowed.

## CONCLUSION

Nextel's motion to intervene for limited purposes should be granted.

November 14, 2005                        Respectfully submitted,

                                         NEXTEL COMMUNICATIONS, INC.
                                         AND NEXTEL OPERATIONS, INC.
                                         By its attorneys,


                                         _Richard McMillan_
                                         _____
                                         Richard McMillan, Jr.
                                         Clifton S. Elgarten
                                         Michael J. Songer
                                         CROWELL & MORING, LLP
                                         1001 Pennsylvania Avenue, N.W.
                                         Washington, D.C.  20004-2595
                                         Telephone: (202) 624-2500
                                         Facsimile:  (202) 628-5116

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2005, I caused true and correct copies

of the Motion to Intervene for Limited Purpose to be served on the following by

third-party commercial carrier for overnight delivery:

AT&T WIRELESS PCS, CINGULAR WIRELESS LLC, and CMT PARTNERS:
Claudia Wilson Frost
Mayer, Brown, Rowe & Maw, LLP
700 Louisiana Street, Suite 3600
Houston, TX 77002
Telephone: (713) 547-9636

BOSTON COMM. GROUP, INC. and WESTERN WIRELESS CORP.:
Donald R. Dunner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, N.W., Suite 1100,
Washington, DC 20001-4413
Telephone: (202) 408-4062

FREEDOM WIRELESS, INC.:
Marshall M. Searcy, III
Quinn Emanuel Urquhart Oliver & Hedges, LLP
865 South Figueroa Street, 10th Floor,
Los Angeles, CA 90017
Telephone: (213) 443-3152

ROGERS WIRELESS, INC.:
Mark D. Wegener
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402
Telephone: (202) 783-0800

Brian M. Koide

# EXHIBIT D

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

---

FREEDOM WIRELESS v BOSTON COMM, 06-1020

---

Motion to Stay Injunction Pending Appeal

---

Richard McMillan, Jr.
Clifton S. Elgarten
Michael J. Songer
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Putative Intervenors
Nextel Communications, Inc. and
Nextel Operations, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT


FREEDOM WIRELESS V. BOSTON COMM

No. 06-1020

CERTIFICATE OF INTEREST

Counsel for Intervenors Nextel Communications, Inc. and Nextel Operations, Inc. Nextel Communications, Inc. and Nextel Operations, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is: Nextel Communications, Inc. and Nextel Operations, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  NA

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Nextel Communications, Inc., Nextel Finance Corp., and Sprint Nextel Corp.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Crowell & Moring LLP:  Richard McMillan, Jr., Clifton S. Elgarten, and Michael J. Songer.

Burns & Levinson:  Dennis J. Kelly and Victoria L. Walton.


November 14, 2005

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone No.: (202) 624-2500
Facsimile No.: (202) 628-8844
e-mail: rmcmillan@crowell.com

## TABLE OF CONTENTS

INTRODUCTION .............................................................................................1

STATEMENT .................................................................................................3

ARGUMENT ................................................................................................11

    A.    Substantial Likelihood of Success on the Merits................................12

    B.    Nextel Would Be Irreparably Harmed Without a Stay........................16

    C.    Staying the Injunction Will Not Harm Freedom.................................17

    D.    The Public Will Suffer Needless Harm Without a Stay .......................17

# TABLE OF AUTHORITIES

**Cases**

*Shields v. Halliburton Co.,*
 493 F. Supp. 1376 (W.D. La. 1980) ...................................................................13

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.,*
 424 F.3d 1293 (Fed. Cir. 2005) ...................................................................12, 18

*Mobil Oil Corp. v. Filtrol Corp.,*
 501 F.2d 282 (9th Cir. 1974) ...................................................................14

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.,*
 897 F.2d 511 (Fed. Cir. 1990) ...................................................................11, 18

*Thomson-Houston Electric Co. v. Ohio Brass Co.,*
 80 F. 712 (6th Cir. 1897) ...................................................................13


**Statutes**

35 U.S.C. § 271 ...................................................................3, 13

35 U.S.C. § 283 ...................................................................8


**Other Authorities**

Chisum on Patents § 17.02 (2002) ...................................................................13

- iii -

## INTRODUCTION

Nextel Communications Inc. and Nextel Operations Inc., ("Nextel"), were not parties in the proceedings below.[1]  Nextel has moved to intervene in this appeal for limited purposes – limited to those issues upon which Nextel may properly intervene at this late date.[2]  Nextel seeks to challenge the scope of an overly broad injunction issued by the district court at the conclusion of the case, and to stay the effect of that injunction until its merits can be reviewed.  Notwithstanding a long course of proceedings in which plaintiff pursued a theory that would *not* impact Nextel's rights, and during which the court itself made quite clear that no order affecting Nextel would be issued because the underlying case did *not* involve an adjudication of

---

[1]    Nextel is a national telecommunications company which recently merged with a subsidiary of Sprint Corporation to form Sprint Nextel Corporation ("Sprint Nextel"), the third-largest wireless service provider in the United States.  Ex. A (Declaration of Phillip Cooke) ¶ 1.  Sprint Nextel, through its subsidiaries, operate in a variety of telecommunications markets, including prepaid wireless.  *Id.*

[2]    Following the district court's issuance of the injunction, and the public statements of plaintiff's counsel on the scope of the injunction immediately thereafter (which we describe below), Nextel moved to intervene in the trial court proceedings in order to seek a stay of the injunction, a narrowing modification or clarification of the injunction, and the prospective disqualification of one of plaintiff's counsel.  The court denied Nextel's motion to intervene without comment.  Nextel has filed a notice of appeal to this Court from the order denying the intervention,  Ex. B (Nov. 10, 2005 Notice of Appeal), but that appeal has not yet been docketed.  Hence, we have not filed a parallel stay motion in that appeal.  We anticipate that the appeal of the denial of the intervention motion will ultimately be consolidated with the instant appeal.  It seems appropriate at this time that the stay of injunction proceed in this appeal, *see* Ex. C (Sept. 30, 2005 Notice of Appeal), subject to consolidation when all the related

(continued...)

Nextel's rights, the district court did indeed issue an order that – as publicly interpreted by plaintiff – improperly purports to limit the rights of Nextel, a non-party, before Nextel has had its day in court. Indeed, it was only *after* the injunction was issued that counsel for the plaintiff first took the explicit position that it would regard the court's injunction as extending to "joint infringement" by Boston Communications Group, Inc. ("BCGI") and non-parties such as Nextel, as if Nextel had in fact been a party to this case. This construction was immediately challenged in the court below,[3] but the trial court rejected all requests to make clear that its injunction did not sweep that broadly, and refused to stay the injunction.

As shown below, it is likely that Nextel's motion to intervene will be granted because Nextel clearly has a unique interest in the scope of the injunction issued by the district court. Nextel timely moved to intervene as soon as plaintiff suggested that it could, or had, obtained an injunction that might affect Nextel's rights. Nextel's interests are not adequately represented by the principal defendant-appellee BCGI because Nextel's interests are either specific to it or diverge in important respects from BCGI's. In addition, Nextel has also filed a separate appeal of the district

———————————————

(...continued)
appeals are docketed. Pursuant to Federal Circuit Rule 8, Nextel also includes the trial court's underlying judgment. Ex. D (Sept. 1, 2005 Judgment).

[3]    Ex. E (Nextel's Motion and Supporting Memorandum to Intervene for Limited Purpose); Ex. F (BCGI's Emergency Motion to Clarify or Stay Permanent Injunction Pending Appeal).

court's order denying intervention in that court. *See* Ex. B; *see* n.2 *supra*. A stay of the district court's injunction as applied to Nextel may properly be entered in connection with that appeal.

Moreover, because this appeal presents substantial issues with respect to the propriety and scope of the injunction, and because the harm to Nextel and others resulting from the court's injunction far outweigh any harm to plaintiff arising from a stay, a stay should issue. Nextel has discussed this motion with the other parties to this appeal. Freedom objects and intends to respond.

## STATEMENT

The "joint infringement" theory upon which plaintiff went to the jury, upon which the jury rendered its verdict, and upon which the district court based its injunction, purports to be a carry-over from case law that existed prior to the Patent Act of 1952 (although in important respects it departs even from those pre-1952 boundaries). Whatever currency joint infringement may have had in other contexts in the case law before 1952, however, joint infringement did not survive as a distinct doctrine following the 1952 Act. That Act replaced the doctrine of "joint infringement" with the now well-established doctrines of direct, induced and contributory infringement as defined by 35 U.S.C. § 271. The "joint infringement" theory has never been recognized by this Court.

The "joint infringement" doctrine was resurrected by the district court in this case.[4] As applied by the district court here, the "joint infringement" theory rested squarely on an acknowledgement that no single party alone infringed plaintiff's patents. Rather, the basis for finding "joint infringement" was that two parties, through the combination of their actions, infringed. The actions of either party alone did not. This is precisely how the jury was charged.[5]

---

[4]    The district court ruled that plaintiff Freedom Wireless, Inc. ("Freedom") could only proceed on the "joint infringement" theory and refused to instruct the jury on theories of contributory or induced infringement. Ex. G (May 10, 2005 Order) ¶¶ 14, 16 (granting judgment as matter of law of no inducement of infringement and no contributory infringement; ruling that the trial court shall instruct the jury on joint infringement only).

[5]    The district court provided the following instruction on joint infringement. That instruction in turn provided the sole basis for the jury's liability verdict:

> Joint Infringement. . . . Under Federal patent law, if separate companies work together to perform all of the steps of a claim of a patent, the companies are jointly responsible, that is, responsible as a group for the infringement of the patent. Even if no single company performs all of the steps of a claim, the companies are jointly responsible. When infringement results from the participation and combined actions of several parties, they are all joint infringers and jointly liable for patent infringement. Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method. Therefore, if you find that defendant, Boston Communication Group, and defendant carriers have worked together to perform all of the steps of any claim of plaintiff's patents, you should find that defendants are jointly responsible for the infringement of that claim.

(continued...)

- 4 -

By structuring its claims in this manner, Freedom limited its infringement theories to a series of "joint" activities of named pairs of defendants. Consistent with this liability theory, the jury on May 20, 2005, rendered verdicts, on four separate verdict forms, finding that each of the separate pairings of BCGI and each of four carrier defendants – Cingular Wireless, LLC ("Cingular"), AT&T Wireless PCS ("AT&T Wireless"), CMT Partners ("CMT"), and Western Wireless Corporation ("Western Wireless") – had "jointly infringed" the patents in suit, literally and under the doctrine of equivalents.

Plaintiff had *not* joined Nextel in this action, even though Nextel had entered into contracts with BCGI for prepaid wireless services that Freedom, in a follow-on lawsuit against Nextel,[6] has since claimed to be analogous to those provided to the named defendants.[7] The genesis of the follow-on lawsuit is significant. Over the course of this case, the court below ruled specifically that Freedom was precluded

---

(...continued)

Ex. H (May 13, 2005 Trial Transcript) at 28:16–29:10.

[6]    *Freedom Wireless Inc. v. Boston Communications Group, Inc.*, No. 05-11061-EFH (D. Mass. filed May 20, 2005) ("Nextel Litigation").

[7]    Nextel began offering prepaid wireless service in 2002, with the introduction of a service branded as "Boost Mobile." Ex. A ¶ 5. In order to implement its prepaid services, Nextel contracted with BCGI in August 2002. *Id.* ¶ 6. Nextel entities own, operate, configure, and maintain the communications network that delivers prepaid services to Boost customers. *Id.* ¶ 5. Nextel now provides its Boost Mobile prepaid wireless service to approximately two million customers throughout the United States. *Id.*

- 5 -

from proving joint infringement with respect to any party *not* named as a defendant, and instructed Freedom that it would have to make such allegations in follow-on suits (which Freedom has since done in the Nextel Litigation). Thus, neither the theory being pursued (*i.e.*, joint infringement involving various pairs of companies that did *not* include Nextel) nor the court's implementation of that theory – in its rulings expressly barring Freedom from claiming joint infringement with respect to non-parties such as Nextel – provided Nextel with any reason to expect that the issues tried in this case would lead to an injunctive order purporting to restrict Nextel in its dealings with BCGI.

More specifically, Freedom presented evidence at trial concerning its activities with respect to four defendant companies, Cingular, AT&T Wireless, CMT, and Western Wireless, but Freedom did *not* present evidence with respect to BCGI's non-defendant customers, including Nextel. To the contrary, the district court held that Freedom had *not* offered sufficient evidence to find BCGI liable for infringement with respect to non-defendant wireless carriers, such as Nextel, and later ruled that "Freedom may pursue claims arising from conduct involving non-defendant carriers in a separate action." Ex. I (Apr. 27, 2005 Order) at 2. As directed by the district court, Freedom filed two separate follow-on actions. *See* Nextel Litigation, No. 05-11061-EFH (D. Mass. filed May 20, 2005); *Freedom Wireless Inc. v. Boston Communications Group, Inc.*, No. 05-11062-EFH (D. Mass. filed May 20, 2005) ("Alltel Litigation").

- 6 -

These rulings should have led, consistent with the jury verdict, to injunctive relief similarly so limited, reflecting the nature of the liability proved at trial. In other words, when the injunction issue came before the trial court in this case, the posture of the case was quite different from what would have been permitted, and even expected, if BCGI had been found *independently* to have infringed. In such a suit, Freedom would have been allowed to present evidence with respect to any infringement by BCGI, and the court could have issued appropriate injunctive relief against BCGI's activities, regardless of what other parties might be indirectly affected.

Under the joint infringement theory that Freedom pursued in the trial court, however, it was only the pairing of BCGI's conduct with that of specific other defendants that would give rise to an infringement. It should, therefore, have been only those paired activities that were enjoined. It quickly transpired, however, that Freedom had a different goal. It now claims to have bypassed its own follow-on lawsuit against Nextel and obtained injunctive relief in this case directly governing Nextel's activities with BCGI.

This claim is, at a minimum, surprising, given the briefing that led to the issuance of the injunction. A review of that briefing discloses the following:

    (1)    Freedom proposed certain injunction language;

    (2)    BCGI in its opposition brief complained that the injunction language proposed by Freedom could be

- 7 -

construed as broad enough to cover BCGI's activities
with Nextel, and objected to this overbreadth;

(3)     Freedom, in its reply to BCGI's opposition, purported
to disclaim this overbroad construction, claiming that
Freedom "is not seeking to enjoin any conduct that
the Court ruled was beyond the scope of this action,
and that was not presented at trial."[8]

On October 17, 2005, Nextel received a copy of the district court's Order for

Permanent Injunctive Relief Pursuant to 35 U.S.C. § 283 ("Injunction Order"), which

was signed on October 12, 2005, but not entered until October 17, 2005. That Order,

using language taken largely from Freedom's motion, states in part:

This injunction prohibits each defendant and . . . *those
persons in active concert or participation with one or more
of the foregoing who receive actual notice of this Order by
personal service or otherwise* from (i) individually making,
using, selling, or offering to sell any of the above-listed
implementations, or any systems that are not colorably
different, (ii) jointly making, using, selling, or offering to
sell any of these implementations, or any systems that are
not colorably different, or (iii) *acting in concert with any
third party, other than a licensee of Freedom Wireless, Inc.,
to make, use, sell, or offer to sell any of these
implementations, or any systems that are not colorably
different.*

Ex. K (Injunction Order) at 1-2 (emphasis added).

In light of Freedom's reply brief, Nextel understood, consistent with the long

course of proceedings and Freedom's theory of the case, that this Injunction Order

---

[8]     Ex. J (Oct. 14, 2005 Freedom Reply Brief in Further Support of its Motion for
Injunctive Relief) at 6.

was not intended to reach the activities of Nextel, a non-party. However, the following day, on October 18, 2005, Nextel learned of a press release issued by plaintiff's counsel, Quinn, Emanuel, Urquhart, Oliver & Hedges, commenting on the injunction and its scope. While not mentioning Nextel by name, the press release specifically identified other carriers, including Alltel Corp. ("Alltel") and Cincinnati Bell, Inc. ("Cincinnati Bell"), which like Nextel were not parties in the instant litigation. Like Nextel, Alltel and Cincinnati Bell have also been sued in separate litigation pending before the district court.[9] The press release asserts that the injunction does, in fact, prohibit BCGI from providing prepaid wireless services "jointly with *any other companies*" and "thus prohibits BCGI *and its current carrier customers*, including Alltel and Cincinnati Bell, Inc. (CBB), which were named in a recent patent infringement lawsuit by Freedom Wireless, from selling prepaid

---

[9]    Quinn Emmanuel represented Freedom, as one of its counsel, in the underlying litigation. Nextel is a current, and active, client of Quinn Emmanuel. It was and remains apparent that Quinn Emmanuel could not have appeared in a suit asserting joint infringement by Nextel, its current client, or otherwise take positions directly adverse to Nextel, its current client. This provided further assurance to Nextel that no relief sought in this action would run against Nextel: Quinn Emmanuel could not pursue such relief. Thus, it was quite remarkable when, following issuance of the injunction, Quinn Emmanuel appeared to "construe" the injunction as applicable to Nextel. This was the basis for the order of prospective disqualification that Nextel proposed to seek from the district court.

wireless services using the infringing BCGI systems." Ex. L (Press Release) at 1 (emphasis added).[10]

After learning of the Injunction Order and the Quinn Emanuel Press Release, Nextel sought further assurance from Freedom and Quinn Emanuel – a firm that was contemporaneously representing Nextel in major litigation in California – that the Injunction Order was not intended to reach activities of Nextel.  Nextel did not receive such assurances.

Therefore, within approximately a week of issuance of the Injunction Order and the Quinn Emanuel Press Release, Nextel moved to intervene for the limited purpose of clarifying, staying, or amending the Injunction Order and to disqualify Quinn Emanuel due to its direct conflict resulting from its concurrent representation of both Nextel and Freedom.  On November 9, 2005, the district court denied Nextel's motion to intervene without stating any reasons.

---

[10]    The Quinn Emanuel Press Release states in part:

> The injunction prohibits any of the defendants from making, using, or selling prepaid wireless services based on the systems found to infringe, either by themselves *or jointly with any other companies,*" said Bill Price, lead trial lawyer for the plaintiff and chair of Quinn Emanuel Urquhart Oliver & Hedges LLP's trial practice.  *It thus prohibits BCGI and its current carrier customers, including Alltel and Cincinnati Bell, Inc. (CBB), which were named in a recent patent infringement lawsuit by Freedom Wireless, from selling prepaid wireless services using the infringing BCGI systems.*

Ex. L at 1 (emphasis added).

Accordingly, Nextel has complied with its duties under Rule 8(a)(1) of the Federal Rules of Appellate Procedure by first moving in the district court below for a stay of the injunction. Pursuant to Rule 8(a)(2) of the Federal Rules of Appellate Procedure, Nextel now seeks a stay of the Injunction Order pending appeal to this Court, at least with respect to Nextel. As set forth below, Nextel will be irreparably harmed if such a stay is not granted.

## ARGUMENT

This Court follows a well-established test in determining whether a stay of an injunction, pending appeal, should be granted. *See Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). The only nuance with respect to that test as applied to this motion is that, as an intervenor, Nextel should also be expected to demonstrate a likelihood that its motion to intervene would be granted. The case for intervention is set forth in Nextel's separately filed Motion to Intervene, and is compelling. Nextel seeks a limited role with respect to issues on which it has a unique interest. No other defendant can adequately represent that interest. Nextel timely filed. Until it moved to intervene, Nextel was not a party to the litigation below, and it did not learn of the Injunction Order until eight days before it sought to intervene in the district court. With that intervention denied, Nextel has promptly moved to intervene here. *See* Motion to Intervene for Limited Purpose (filed simultaneously with this Motion). Moreover, Nextel has filed a Notice

of Appeal from the denial of intervention below and certainly has standing to seek a stay in connection with that appeal. *See* Ex. B.

Accordingly, we turn to this Court's four-part test governing whether the injunction should be stayed at least as to Nextel.

## A.    <u>Substantial Likelihood of Success on the Merits</u>.

There is a clear likelihood that Nextel will prevail on the merits of the issues concerning the scope of the injunction. In this brief, we focus on a principal issue affecting the scope of the injunction, but we note that BCGI and the other defendants in the case, *i.e.* the parties to that case, intend to raise a number of additional issues that independently demonstrate a likelihood of success in overturning the injunction. Of course, in a case like this, where the harm resulting from denial of the stay is substantial, a lesser showing of likelihood of success is required. *Standard Havens*, 897 F.2d at 513.

The sole theory of liability in this case, "joint infringement," is novel. This Court has never recognized such a theory, and should not do so here.[11] "Joint infringement" was the common law doctrine that preceded the creation of statutory

---

[11]    Recent authority from this Court suggests the joint infringement theory would be rejected. *See Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005) (holding that the actions of the defendant medical device manufacturer could not be joined with the actions of surgeons to establish infringement where no agency relationship existed).

liability for induced and contributory patent infringement.[12]  As such, the law of

"joint infringement" developed *before* enactment of the Patent Act of 1952, 35 U.S.C.

§ 271, and has since been superceded and preempted as a basis for patent liability by

that statute.  *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1468-69

(Fed. Cir. 1990) (noting that pre-1952 common law concepts of contributory

infringement were codified into 35 U.S.C. §§ 271(b) and 271(c)).  Even then, "joint

infringement" required an intent that the joint act infringe the patent.[13]  Any conduct

previously captured by the common law theory of "joint infringement" is now

actionable, if at all, only within the statutory categories of "direct infringement,"

"inducement," and "contributory infringement."  *See Hewlett-Packard*, 909 F.2d at

1468-69; U.S.C. §§ 271(a)-(c).  Thus, the theory upon which the claim here rests

simply does not exist and, in fact, has never existed.[14]

---

[12]    Prior to the Patent Act of 1952, "joint infringement" and "contributory infringement" were used synonymously.

[13]    "It is well settled that where one makes and sells one element of a combination covered by a patent with the intention and for the purpose of bringing about its use in such a combination he is guilty of contributory infringement and is equally liable to the patentee with him who in fact organizes the complete combination." *Thomson-Houston Electric Co. v. Ohio Brass Co.*, 80 F. 712, 721 (6th Cir. 1897); *see also*, 5 Donald S. Chisum, Chisum on Patents § 17.02 (2002).  We do not suggest perfect consistency in the pre-1952 case law, but the prevailing view even pre-1952 is easy to discern.

[14]    There are some cases, post-1952, that refer to joint infringement, some of which recognize joint infringement and some of which did not.  *Compare Shields v. Halliburton Co.*, 493 F. Supp. 1376, 1389 (W.D. La. 1980) (finding that defendants
(continued...)

More important for present purposes, even if the theory of "joint infringement" adopted by the trial court was viable, the injunction that the trial court granted here – as construed by Freedom to apply to non-parties such as Nextel – turns the theory inside out. It is the essential premise of a "joint infringement" analysis that findings of fact be made, and a judgment entered, with respect to specific "joint infringement" – here, the activities of BCGI and a separate "joint infringer." No such findings have been, or could have been, made with respect to Nextel, a non-party. Indeed, it is Freedom's desire for such findings – that BCGI and Nextel's actions combined to create another "joint infringement" – that explains Freedom's decision to bring a separate lawsuit against Nextel only several months ago. Under these circumstances, the Court should not sustain an injunction directed to Nextel's undocumented and unexplored "joint" activities with BCGI.

Beyond the inherent contradictions involved in trying to transform findings of "joint infringement" involving one pair of defendants into an injunction against "joint

---

(...continued)

"singularly and jointly" infringed the patent), *with Mobil Oil Corp. v. Filtrol Corp.*, 501 F.2d 282, 291-92 (9th Cir. 1974) (questioning "whether a method claim can be infringed when two separate entities perform different operations and neither has control of the other's activities."). These precedents evince no understanding of the origins of "joint infringement" prior to enactment of the Patent Act. When this matter is briefed on the merits in this Court, Nextel will put these few and conflicting precedents in proper historical perspective, and suggest that the Court confine the law to its proper boundaries within the concepts of "direct infringement," "inducement," and "contributory infringement." The 1952 Act makes no mention of "joint infringement."

infringement" by non-parties, there are, of course, fundamental limits on the scope of *any* court injunction. It has long been understood that absent extraordinary circumstances, no party may be bound by a court injunction without being afforded its day in court. *Additive Controls & Measurements Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996) ("[C]ourts of equity have long observed the general rule that a court may not enter an injunction against a person who has not been made a party to the case before it."). The principle that an injunction may not run against a non-party reflects basic notions of due process, as well as an elemental restraint on the federal courts' proper use of their equitable powers. *Id.*

Here, Nextel's day in court with respect to Freedom's claims against it should be yet to come. Under the specific rulings of the trial court, Freedom was required to present its claims asserting "joint infringement" by BCGI and Nextel in a separate suit. Freedom filed such a suit; Nextel is prepared to defend that suit. It has not done so as of yet. Freedom's effort to pretermit that suit by summarily extending the injunction in this suit to cover Nextel has no basis in law, precedent, or equity.

Therefore, Nextel has shown a substantial likelihood that it will prevail upon the merits. It has certainly shown that both the novel theory of liability, and the unprecedented scope of the injunction, raise substantial questions that militate in favor of a stay until these issues are finally resolved in this Court. That is particularly clear in light of the fact that the balance of the harms tips so decisively in favor of a stay.

- 15 -

**B.   Nextel Would Be Irreparably Harmed Without a Stay.**

The injury that would be caused by the district court's application of its Injunction Order to Nextel is severe.[15] If Nextel is enjoined by the Injunction Order from providing its prepaid wireless services beyond the 90-day grace period – which currently runs through January 16, 2005 – Nextel will suffer substantial injury. Ex. A ¶ 6. Nextel uses BCGI's services for all of the prepaid phone calls made by Nextel's more than two million prepaid wireless customers throughout the United States. *Id.* ¶¶ 5, 6. Without BCGI's services, Nextel's ability to offer prepaid wireless phone calls through its Boost Mobile brand would be seriously impacted. *Id.* ¶ 6.

Moreover, the 90-day grace period imposed by the trial court does not provide enough time for Nextel to implement alternative services. *Id.* ¶ 7. In a field such as wireless services, where reliability is paramount, enjoining Nextel's prepaid wireless phone service – even for a few hours, much less several months – would irreparably harm Nextel's Boost Mobile brand and jeopardize Nextel's prepaid wireless phone base. *Id.* ¶ 8.

---

[15]   Of course, Freedom has yet to prove that Nextel and BCGI engaged in any "joint infringement." At issue here is an attempt to extend an injunction to cover the activities of Nextel without any proof that Nextel has done *anything* improper, either individually or in combination with BCGI.

- 16 -

**C.**     <u>Staying the Injunction Will Not Harm Freedom.</u>

In contrast to the harm to Nextel, staying the injunction as to Nextel would not cause any irreparable injury to Freedom at all.  Freedom does *not* offer services or products in the prepaid wireless marketplace.  Its sole business is the licensing of its intellectual property.  Freedom does *not* seek to exclude others from the marketplace.  Hence, any harm to Freedom from staying the injunction is less and "of a different nature than harm to a patentee who is practicing its invention and fully excluding others." *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987).  Accordingly, if indeed any "joint infringement" by Nextel is ever proven, Freedom will be adequately compensated by monetary damages.  If Freedom were to prevail in its suit against Nextel, it will receive just what it would have received, *i.e.* an adequate royalty.  Under standard equitable principles, because Freedom would be adequately protected by monetary relief, there is no basis for the issuance of an injunction to halt Nextel's activities absent a conclusive finding that Nextel has infringed.

**D.**     <u>The Public Will Suffer Needless Harm Without a Stay.</u>

If the injunction is not stayed and Nextel is unable to transition to another vendor without interruption, Nextel's more than two million customers – many of whom cannot qualify for traditional post-paid wireless phone service -- would be

- 17 -

forced to purchase new cellular phones[16] and incur substantial costs to switch to other prepaid wireless phone carriers. Ex. A ¶ 9. Some of Nextel's prepaid wireless customers would no doubt be left without any wireless phone service whatsoever. *Id.* ¶ 10. This would be particularly harmful to Nextel's youth-based Boost Mobile customers who often rely on wireless phone service as their primary mode of communication. *Id.* ¶ 9. The magnitude of harm to Nextel's customers is particularly compelling because the number of customers affected by an injunction issued against Nextel, a non-party, would be *five times* the number of customers served by the defendants found liable at trial. *Compare id.* ¶ 5, *with* Ex. M (Reuters Article) (describing Nextel's two million prepaid customers and Cingular's four hundred thousand prepaid customers).[17]

---

[16]    Nextel's cellular phones operate on a unique iDEN® system not used by any other major cellular service provider, and thus new cellular equipment would have to be purchased by Nextel's customers in order to switch to another carrier. Ex. A ¶ 10.

[17]    In the district court, Freedom asserted that an injunction "will not frustrate any public need for prepaid wireless service" because consumer demand for such service "may be met by Freedom's licensees. . . . Convergys and Telcordia . . ."[17] Ex. N (Sept. 15, 2005 Freedom's Memorandum of Law in Support of its Motion for Injunctive Relief) at 6. Freedom then purported to ensure this protection of consumers by proposing a "90-day grace period during which their customers may transition to other services." *Id.* at 7. Nextel does not believe these services would be commercially feasible and reasonably available within the 90-day grace period. Ex. A ¶ 7. Instead, Nextel's investigation indicates that those vendors will not be available to provide comparable substitute service for at least several months beyond the expiration of the 90-day grace period. *Id.*

In short, in a case in which Freedom has yet to prove that Nextel has done *anything* improper, and where Nextel and its customers will clearly suffer irreparable injury if no stay is granted, the district court's injunction, to the extent it reaches the combined activities of BCGI and Nextel, should be stayed pending appeal.

November 14, 2005

Respectfully submitted,

NEXTEL COMMUNICATIONS, INC.
AND NEXTEL OPERATIONS, INC.
By its attorneys,

Richard McMillan, Jr.
Clifton S. Elgarten
Michael J. Songer
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

- 19 -

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 14, 2005, I caused true and correct copies

of the Motion to Stay Injunction Pending Appeal to be served on the following by

third-party commercial carrier for overnight delivery:

<u>AT&T WIRELESS PCS, CINGULAR WIRELESS LLC, and CMT PARTNERS:</u>
 Claudia Wilson Frost
 Mayer, Brown, Rowe & Maw, LLP
 700 Louisiana Street, Suite 3600
 Houston, TX 77002
 Telephone: (713) 547-9636

<u>BOSTON COMM. GROUP, INC. and WESTERN WIRELESS CORP.:</u>
 Donald R. Dunner
 Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
 901 New York Avenue, N.W., Suite 1100,
 Washington, DC 20001-4413
 Telephone: (202) 408-4062

<u>FREEDOM WIRELESS, INC.:</u>
 Marshall M. Searcy, III
 Quinn Emanuel Urquhart Oliver & Hedges, LLP
 865 South Figueroa Street, 10th Floor,
 Los Angeles, CA 90017
 Telephone: (213) 443-3152

<u>ROGERS WIRELESS, INC.:</u>
 Mark D. Wegener
 Howrey LLP
 1299 Pennsylvania Avenue, N.W.
 Washington, DC 20004-2402
 Telephone: (202) 783-0800

    Brian M. Koide

# EXHIBIT E

06-1020, -1078, -1079

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

Freedom Wireless, Inc.,

*Plaintiff/Counterclaim Defendant-*
*Appellant,*

v.

Boston Communications Group, Inc., et al.,

*Defendant/Counterclaimant-*
*Cross Appellant.*

---

Reply in Support of Motion to Intervene for Limited Purpose

---

Richard McMillan, Jr.
Clifton S. Elgarten
Michael J. Songer
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Movants-*
*Cross-Appellants*
*Nextel Communications, Inc. and*
*Nextel Operations, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

FREEDOM WIRELESS V. BOSTON COMM

Nos. 06-1020, -1078, -1079

CERTIFICATE OF INTEREST

Counsel for Movants-Cross Appellants Nextel Communications, Inc. and Nextel Operations, Inc. certifies the following:

1.      The full name of every party or amicus represented by me is: Nextel Communications, Inc. and Nextel Operations, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  NA

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Nextel Communications, Inc., Nextel Finance Corp., and Sprint Nextel Corp.

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Crowell & Moring LLP:  Richard McMillan, Jr., Clifton S. Elgarten, and Michael J. Songer.

> Burns & Levinson:  Dennis J. Kelly and Victoria L. Walton.

November 28, 2005

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone No.:  (202) 624-2500
Facsimile No.:  (202) 628-8844
e-mail:  rmcmillan@crowell.com

# TABLE OF CONTENTS

**Page**

I.    Nextel's Need For Intervention Arose In Connection
      With The Determination Of The Scope Of The Injunction
      And Is Not "Excessively Late".....................................................................1

II.   Nextel's Distinct Interests In The Scope Of The Injunction
      Are Not Adequately Represented By Other Parties To The Appeal.....................5

III.  Nextel Has A Particularized Interest In Issues Concerning
      Freedom's Counsel's Conflict Of Interest.................................................6

      A.    There Is No Rule Against Allowing Intervenors
            Raising Collateral Issues Of The Type At Issue Here.........................6

      B.    Nextel's Motion Cannot Be Rejected Because
            "There Is No Basis to Disqualify Quinn Emanuel" ...........................8

CONCLUSION.................................................................................10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Grand Jury Subpoena,*
    274 F.3d 563 (1st Cir. 2001)...................................................................7

*International Rectifier Corp. v. Samsung Elec. Co.,*
    361 F.3d 1355 (Fed. Cir. 2004) ..........................................................4

*International Rectifier Corp. v. Samsung Elec. Co.,*
    424 F.3d 1235 (Fed. Cir. 2005) ..........................................................4

*United States v. City of New York,*
    198 F.3d 360 (2d Cir. 1999) ..............................................................6-7

Nextel Communications Inc. and Nextel Operations Inc. ("Nextel") submit this brief Reply to Freedom Wireless, Inc.'s ("Freedom's") Opposition to Nextel's Motion To Intervene For Limited Purposes.

I.   **Nextel's Need For Intervention Arose In Connection With The Determination Of The Scope Of The Injunction And Is Not "Excessively Late."**

Freedom's principal theory is that Nextel's motion to intervene is "excessively late" because Nextel's "business interest" in this case arose when it first contracted with Boston Communications Group, Inc. ("BCGI") in 2002, and Nextel monitored this case once Freedom filed a separate case against BCGI and Nextel earlier this year.  Freedom confuses the nature of Nextel's *business* interests – which Nextel has in many business and litigation activities that could affect it – with Nextel's direct *legal* interest in these proceedings now, which form the basis for Nextel's requested intervention as of right. Nextel's legal interest, at issue here, arose when Freedom asserted that the district court's injunction directly barred conduct that was not the subject of the case, and which had not been determined to be infringing, namely, the combined actions of BCGI and Nextel. Nextel has a clear, cognizable legal interest in not having an injunction extend to its activities.

Although Freedom professes astonishment that Nextel did not intervene years ago, Freedom told Nextel in January 2005 that it had no interest in litigating with Nextel and expected Nextel to feel the same. *See* Motion to Intervene at 8.  Indeed, more interesting than what Freedom does say in its brief is what is does not say:  Freedom fails to explain how Quinn Emanuel Urquhart Oliver & Hedges, LLP ("Quinn Emanuel") – Nextel's

principal West Coast counsel for years – could rationally conclude that Nextel's legal

interests were *not* being directly impacted in this case, while Nextel, from a less informed

position, was supposed to have concluded just the opposite.

These unexplained incongruities highlight the difference between the business

interest in this case that Freedom claims Nextel should have recognized long ago, and the

specific injury to cognizable legal interests, arising from Freedom's effort to extend the

injunction to encompass the ongoing contractual relationship between Nextel and BCGI,

that prompted Nextel to intervene. A party may have a *business* interest in monitoring a

patent case if someone with whom it is doing business is a defendant and the resolution

of the suit could affect the supply of a product or service. It may similarly have a

*business* interest in the suit if conduct that parallels its own conduct is alleged to infringe

and a party wants to understand why. But the law does not insist that such a party

intervene when its direct *legal* interests are *not* at issue, *i.e.*, where its own conduct was

not being judged. This is particularly clear in an extreme case like this where the court

had expressly held that the BCGI-Nextel relationship was not put at issue by Freedom's

joint infringement theories here.

Freedom's opposition to the motion to intervene ducks these core issues, and

instead argues from the unstated assumption that Freedom put Nextel's alleged "joint

infringement" with BCGI at issue from day one. But this is demonstrably false.

Freedom chose to pursue a case in which Freedom asserted that no single party infringed

by its own actions. The infringement claims were based on the combined actions of

specific pairs of parties, named defendants in this suit. To be sure, Nextel properly

monitored the proceedings – once it was sued directly in a separate lawsuit – so that it would be alert to any turn of events in which its activities with BCGI were called into question. But without such a turn of events, Nextel had no reason or basis to intervene.

Indeed, the district court's orders initially made the limits of this lawsuit under Freedom's joint infringement theory quite explicit. The district court ruled that Freedom could only proceed against the named pairs of "joint infringers," the specific parties to the case. *See* Motion to Intervene at 9. This, in turn, prompted Freedom to file a separate action against BCGI and Nextel. *Id.* Nextel properly expected issues concerning its combined actions with BCGI to be judged in that action, not this one.

Finally, even in connection with the briefing in this case concerning the wording of the injunction, there was no reason for Nextel to intervene. The injunction was to reflect findings of specific joint infringements by named pairs of defendants; Freedom assured the district court that the proposed injunction would *not* extend beyond "the same activities with the same implementations *that were actually found to infringe* Freedom's patents-in-suit." Ex. J to Motion to Intervene at 6. (emphasis added). Freedom did not flip flop on that limitation until *after* the injunction was issued, when it took the position that the injunction encompassed the combined actions of BCGI and non-parties to this suit, whose conduct had never been subject to this lawsuit.

Significantly, Freedom did nothing to discourage Nextel's belief that notwithstanding whatever indirect interest Nextel may have had in this case, this case would not *directly* affect Nextel. Freedom's January 25, 2005 letter to Nextel did not suggest that the combined activities of BCGI-Nextel were being adjudged in this case.

- 3 -

*See* Motion to Intervene at 8.  And Nextel and Sprint had reason to feel specially assured: one of their regular counsel was acting as counsel for Freedom in this case and was ethically barred from taking action directly adverse to them.  *See infra* Section III.C. Nextel had every reason to understand that this case would *not* determine the propriety of its combined activities with BCGI.

Not until after the injunction issued, and in connection with the motions in the district court to clarify the scope of the injunction, did Nextel have reason to intervene to protect a legal interest.  There is nothing inappropriate about a party seeking to intervene when it suddenly finds itself subject to a court's injunction in connection with an action in which the conduct to be enjoined had *not* been at issue in the suit.  *See, e.g., International Rectifier Corp. v. Samsung Elec. Co.*, 361 F.3d 1355, 1362 (Fed. Cir. 2004) (discussing non-party intervenor's motion in the district court to "clarify, vacate or modify the Permanent Injunction" to make clear that it did not reach its conduct and activities).[1]

Freedom actually disputes none of this, but sees no injustice in binding Nextel to

---

[1]     IXYS is referred to as the non-party appellant in the caption of this case. 361 F.3d at 1355.  A subsequent decision of this Court dealing with the same proceedings explains the procedural posture of the case in more detail.  424 F.3d 1235, 1240-41 (Fed. Cir. 2005).  It clearly appears that IXYS was not a party to the original infringement action against Samsung, which resulted in an injunction against Samsung and others acting in concert with Samsung.  When the plaintiff brought contempt proceedings, IXYS intervened to "clarify, vacate or modify" the injunction.  361 F.3d at 1357.  The district court denied the motion to modify the injunction, at which point IXYS appealed the denial of its motion to this Court.  This Court reversed, holding that IXYS, "as a non-party, cannot be bound by the Permanent Injunction."  *Id.* at 1362.

the injunction, or compelling Nextel to pay royalties.  But if it is to be enjoined, Nextel

should be permitted to appear in this Court to defend itself.

## II.     Nextel's Distinct Interests In The Scope Of The Injunction Are Not Adequately Represented By Other Parties To The Appeal.

Freedom asserts that the interests of BCGI and Nextel are aligned, noting that

BCGI and Nextel have sought a similar partial stay of the injunction.  But as a *non-party*

that suddenly finds its own continuing conduct subject to a federal injunction, Nextel has

a specific legal interest distinct from that of any other party.  No other party is in a

position to argue the constitutional and jurisprudential impropriety of extending an

injunction to cover actions of a *non-party*.

Moreover, both BCGI's interests, and those of the other carrier defendants,

diverge significantly from Nextel's.  Nextel is interested in pursuing issues in the

application of the injunction to it.  The other carrier defendants – Nextel's competitors –

are economically adverse to Nextel on that issue.  And while BCGI's economic interests

may, in theory, coincide with Nextel's to some degree, BCGI's business viability over the

course of this appeal is uncertain, and its economic predicament, at the very least, puts

pressure on BCGI to potentially reach a resolution that leaves an injunction in place that

extends to the combined actions of BCGI and Nextel.

In sum, Nextel has a particularized interest in limiting the application of the

injunction to *it* that is not adequately represented on appeal absent intervention.  There

are important constitutional arguments that only Nextel has proper standing to assert, and

there are specific interests particular to Nextel that other parties in this far ranging appeal

- 5 -

cannot be depended upon to assert.  On these grounds alone, intervention is appropriate.

**III.    Nextel Has A Particularized Interest In Issues Concerning Freedom's Counsel's Conflict Of Interest.**

Freedom does not dispute that Nextel has an interest in the ethical conduct of Freedom's counsel not possessed by BCGI.  Only Nextel can assert the conflict of interest that requires disqualification of one of Freedom's counsel from its continued participation in the case.  Although Freedom makes a variety of arguments about whether intervention should include the disqualification issue, most of those arguments address the merits of the future motion and are best resolved on full briefing.  Freedom asserts that the disqualification issue would complicate the appeal.  But if the Court believes it appropriate to separate the disqualification issues from the merits of the appeal, Nextel would, of course, present its position on disqualification by way of motion separately from, and prior to, briefing on the merits, if this is the Court's wish.

**A.    There Is No Rule Against Allowing Intervenors Raising Collateral Issues Of The Type At Issue Here.**

Freedom asserts that there is a rule against allowing a non-party to intervene to raise "collateral" issues.  Suffice it to say that there is no such rule – at least in the sense that the word "collateral" is being used here.  The case cited by Freedom, *United States v. City of New York*, 198 F.3d 360 (2d Cir. 1999), involved an attempt to inject an *extrinsic* "merits" issue into a case.  The Second Circuit properly rejected that attempt because it is generally up to the parties – not an intervenor – to determine the scope of a lawsuit, and what issues will be raised.  The proposed intervenor did not have a "'direct,

- 6 -

substantial, and legally protectable' interest" in the subject matter of the action, and thus intervention was not allowed. *Id.* at 365.

Issues of attorney disqualification are "collateral" in an entirely different sense. So long as a law firm with an obligation of loyalty to Nextel is acting in direct conflict to Nextel – as Quinn Emanuel is now by insisting that Nextel's ongoing combined activities with BCGI are barred by the district court's injunction – Nextel's right to loyal counsel is being directly and adversely trampled on an ongoing basis. This is intimately intertwined with the merits of the lawsuit, and is in fact tied directly to the scope of relief that Freedom – not Nextel – sought to put at issue. Having advocated an overly broad injunction directly adverse to the interests of a major client, Quinn Emanuel has itself injected the propriety of its behavior into this lawsuit. The motion to disqualify is the proper mechanism for vindicating the proper ethical standards that must govern this proceeding. A party seeking disqualification has a direct, substantial and legally protectable interest in the ongoing loyalty of its counsel.

Courts, including the First Circuit (which provides the controlling law here), have had little difficulty recognizing that intervention is appropriate to protect similar "collateral" interests. *See In re Grand Jury Subpoena*, 274 F.3d 563, 570 (1st Cir. 2001) (finding privilege claims support intervention when privileged information would otherwise be disclosed pursuant to grand jury subpoena).

Although a disqualification motion is the time-honored means of addressing conflicts of counsel, the twist in this case is that the law firm in question is acting in a manner directly adverse to Nextel, *a non-party*, by seeking to extend an injunction to

encompass its ongoing activities with BCGI. Courts have rarely encountered such direct conflicts involving non-parties. When they have, however, they have recognized that the proper way to proceed to redress this continuing injury is for the injured party, here Nextel, to seek disqualification *via* a motion to intervene. *See* Motion to Intervene at 13-14 (citing *In re Yarn Processing* and *Cruz*).

**B.    Nextel's Motion Cannot Be Rejected Because "There Is No Basis to Disqualify Quinn Emanuel."**

Freedom also suggests that Nextel's motion to intervene to address the disqualification issue can be rejected on the merits because "there is no basis to disqualify Quinn Emanuel." Freedom Opp'n at 16. Freedom does not deny that Quinn Emanuel's effort to overextend the reach of the injunction to cover combined actions of Nextel and BCGI is a clear conflict of interest. Rather, Freedom's theory is that the conflict was created when Nextel contracted with BCGI for services in August 2002, and consequently was (a) created by Nextel and (b) is untimely asserted. Although these assertions and arguments more properly go to the merits of the disqualification motion, rather than intervention, Nextel will respond briefly here.

The conflict did *not* arise because Nextel contracted with BCGI. When Nextel contracted with BCGI, neither Quinn Emanuel nor Nextel perceived or asserted any conflict. Quinn Emanuel, for its part, did not perceive any conflict – as it clearly does now. To the contrary, as explained above in Section I, the case at that point was proceeding in a standard manner, where Nextel could be interested in a *business* sense

with the outcome, but Quinn Emanuel was not acting in a manner directly adverse to Nextel.

In light of the fact that Freedom has raised the issue, it is fair to document that Quinn Emanuel *assured* Nextel (and Sprint) that the case posed no conflict, and that Quinn Emanuel would not take actions adverse to Nextel. In connection with the Sprint-Nextel merger, Sprint asked Quinn Emanuel to identify "any actual or potential conflicts" that would exist if the merger were to go forward. Ex. A (Apr. 11, 2005 Letter from Gerke to Purcell). In response, Quinn Emanuel stated that no conflicts of interest existed with the entities listed on an attached document, which included the relevant entities for purposes of this case. Ex. B (Jul. 11, 2005 Conflict Interest Statement). Even earlier, in March 2005, Quinn Emanuel had assured Nextel by e-mail that it would not have any involvement in taking any actions with respect to Nextel in this case, or in the future. *See* Ex. C (Mar. 10, 2005 e-mail from Quinn Emanuel to Nextel) ("no one at my firm has any invovlement [sic] with anything to do with Nextel [with respect to] the [Freedom Wireless] case or will have in the future.").

That adversity was created – sharply, directly, and materially – when Quinn Emanuel purposefully sought and obtained an injunction that, according to the description in Quinn Emanuel's subsequently issued press release, would extend to BCGI and Nextel's combined activities. *See* Motion for Intervene at 10. At that point, whatever ethical line Quinn Emanuel had been walking, it stepped decisively over that line and asserted a claim directly adverse to Nextel.

- 9 -

Freedom argues that in determining whether disqualification is appropriate in a particular circumstance, it will be necessary to consider prejudice to Freedom from disqualification at this stage of the proceedings. On that issue, it is fair to observe that just as Quinn Emanuel was assuring Nextel that it would not and could not take actions adverse to Nextel, it had undoubtedly informed Freedom of that same fact long ago, as it was required to do.[2] These arguments about timeliness and prejudice may well have to be addressed on the merits. But Freedom has offered no reason why Nextel should not be allowed to intervene to present these issues for determination on the merits.

## CONCLUSION

The motion to intervene should be granted.

November 28, 2005                    Respectfully submitted,

                              NEXTEL COMMUNICATIONS, INC.
                              AND NEXTEL OPERATIONS, INC.
                              By its attorneys,

                              Richard McMillan, Jr.
                              Clifton S. Elgarten
                              Michael J. Songer
                              CROWELL & MORING, LLP
                              1001 Pennsylvania Avenue, N.W.
                              Washington, D.C.  20004-2595
                              Telephone: (202) 624-2500
                              Facsimile:  (202) 628-5116

---

[2]    Freedom clearly knew of this issue. When Freedom filed its separate cases against Alltel and Nextel, *see* Motion to Intervene at 2, Quinn Emanuel did not serve as counsel to Freedom in the suit against Nextel. A different firm, presumably fully capable of addressing the issues in suit, served as counsel.

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2005, I caused true and correct copies of the Reply in Support of Motion to Intervene for Limited Purpose to be served on the following by facsimile and by a third-party commercial carrier for overnight delivery:

AT&T WIRELESS PCS, CINGULAR WIRELESS LLC, and CMT PARTNERS:
Claudia Wilson Frost
Mayer, Brown, Rowe & Maw, LLP
700 Louisiana Street, Suite 3600
Houston, TX 77002
Telephone: (713) 547-9636

BOSTON COMM. GROUP, INC. and WESTERN WIRELESS CORP.:
Donald R. Dunner
Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
901 New York Avenue, N.W., Suite 1100
Washington, DC 20001-4413
Telephone: (202) 408-4062

FREEDOM WIRELESS, INC.:
Paul F. Ware, Jr.
Goodwin Procter, LLP
Exchange Place
Boston, MA 02109-2881
Telephone: (617) 570-1000

ROGERS WIRELESS, INC.:
Mark D. Wegener
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402
Telephone: (202) 783-0800

Brian M. Koide



 **Sprint**

Thomas A. Gerke
EVP–General Counsel and External Affairs

Law & External Affairs
KSOPHF0410-4A203 – Eisenhower A
6200 Sprint Parkway
Overland Park, KS 66251-6117
Telephone (913) 794-1440
Fax (913) 523-7700

April 11, 2005

## ATTORNEY-CLIENT PRIVILEGED COMMUNICATION

John Purcell
Quinn Emanuel Urquhart Oliver & Hedges
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017

Re:    Engagements for Sprint Corporation and Subsidiaries

Dear Mr. Purcell:

Our records indicate that your firm is currently representing Sprint Corporation or one or more of its subsidiaries in legal matters. As you know, on December 15, 2004, Sprint and Nextel Communications, Inc. entered into an agreement to merge. Subject to various necessary approvals and other conditions, it is currently anticipated that the merger will close in the third quarter of 2005.

Sprint's Outside Counsel Policy requires that you treat Sprint Corporation and all of its subsidiaries as your client for professional responsibility purposes. As a result, it will be necessary for your firm to update the conflicts check conducted at the outset of each of your representations to include the Nextel entities on the enclosed list. For your use in identifying all current Sprint matters handled by your firm, I also enclose a copy of the current Sprint entity list.

Please provide information regarding any actual or potential conflicts that would exist if the merger is consummated, or complete the attached statement indicating that no such conflicts will exist, to Velinda Brown at the address below no later than May 20, 2005.

Velinda Brown
6450 Sprint Parkway
Mailstop KSOPHN0304-3B418
Overland Park, Kansas 66251

If you have any questions regarding this request, please contact Nancy Shelledy at 913-315-9913 or Tonya Johnston at 913-315-9383. Thank you for the legal assistance you are providing Sprint and thank you in advance for your prompt response to the above request.

Very truly yours,

*Tom Gerke*

Thomas A. Gerke

**B**

**Conflict of Interest Statement**

Consistent with Sprint's Outside Counsel Policy, _Quinn Emanuel_ ("Firm") has conducted a review of its records, and has determined that no conflicts of interest exist with any of the entities listed on the two attachments to the April 2005 letter from Thomas A Gerke. Alternatively, if actual or potential conflicts of interest have been identified, they are described in an attachment to this statement.

_Quinn Emanuel_
Name of Firm

Signature of Authorized Representative

_John Purcell_
Printed Name of Signator

_7/11/05_
Date

C

**Koide, Brian**

| | |
|---|---|
| **From:** | Dominic Surprenant [dominicsurprenant@quinnemanuel.com] |
| **Sent:** | Thursday, March 10, 2005 5:28 PM |
| **To:** | Haller, Susan |
| **Subject:** | Freedom Wireless |

Sue.

My firm is trying a case in Boston called Freedom Wireless, where we represent the plaintiff versus a variety of cell providers in what I understand to be essentially a patent infringement lawsuit.  Nextel is not a defendant and I have never been involved in the case in any fashion.

It is my understanding that when we took on the representation five years ago, we told our Freedom Wirless clients that we represented Nextel and could not be adverse to Nextel under any circumstances, and our clients agreed to that condition.

It is also my understanding that our FW clients hired another firm which specializes in licensing agreements and that firm sent out letters to a variety of cell providers, including Nextel, about taking out a license.

Finally, it is my understanding through the grapevine Nextel has a lawyer monitoring the trial, which started several days ago.

Obviously, no one at my firm has any invovlement with anything to do with Nextel w/r/t the FW case or will have in the future.

However, when I heard through the grapewine that our clients had otherwise contacted Nextel, and Nextel (per the rumor mill) is monitoring the trial, I told the relevant partners here that I wanted to make sure the firm's Nextel client was apprized of where things stand.

I think my firm's role, or my role here, is of course strictly limited to offering to be an honest broker to facilitate a sensible business deal, if Nextel should want us to do so.

If you have any questions, Sue, please let me know.

Thanks.

1

# EXHIBIT F

**06-1020, -1078, -1079**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

Freedom Wireless, Inc.,

*Plaintiff/Counterclaim*
*Defendant-Appellant,*

v.

Boston Communications Group, Inc., et al.,

*Defendant/Counterclaimant-*
*Cross Appellant.*

---

Reply in Support of Motion to Stay Injunction Pending Appeal

---

Richard McMillan, Jr.
Clifton S. Elgarten
Michael J. Songer
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

*Attorneys for Movants-*
*Cross-Appellants*
*Nextel Communications, Inc. and*
*Nextel Operations, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

FREEDOM WIRELESS V. BOSTON COMM

Nos. 06-1020, -1078, -1079

CERTIFICATE OF INTEREST

Counsel for Movants-Cross Appellants Nextel Communications, Inc. and Nextel Operations, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is: Nextel Communications, Inc. and Nextel Operations, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  NA

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Nextel Communications, Inc., Nextel Finance Corp., and Sprint Nextel Corp.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Crowell & Moring LLP:  Richard McMillan, Jr., Clifton S. Elgarten, and Michael J. Songer.

    Burns & Levinson:  Dennis J. Kelly and Victoria L. Walton.

November 28, 2005

Richard McMillan, Jr.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone No.:  (202) 624-2500
Facsimile No.:  (202) 628-8844
e-mail:  rmcmillan@crowell.com

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3D Systems, Inc. v. Aarotech Labs, Inc.,*
    160 F.3d 1373 (Fed. Cir. 1998) ..........................................................................8

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.,*
    96 F.3d 1390 (Fed. Cir. 1996) ............................................................................4

*Eli Lilly and Co. v. Aradigm Corp.,*
    376 F.3d 1352 (Fed. Cir. 2004) ..........................................................................7

*Gerosa v. Columbia Metal Stamping & Die Co.,*
    8 F.2d 611 (6th Cir. 1925) ..................................................................................5

*International Rectifier Corp. v. Samsung Elec. Co.,*
    361 F.3d 1355 (Fed. Cir. 2004) ...................................................................... 3-5

*International Rectifier Corp. v. Samsung Elec. Co.,*
    424 F.3d 1235 (Fed. Cir. 2005) ...................................................................... 3-4

*Invitrogen Corp. v. Clontech Labs., Inc.,*
    --- F.3d ---, 2005 WL 3078495 (Fed. Cir. Nov. 18, 2005)................................7

*New Jersey Patent Co. v. Schaeffer,*
    159 F. 171 (C.C.Pa. 1908).................................................................................6

*Nike, Inc. v. Wal-Mart Stores, Inc.,*
    138 F.3d 1437 (Fed. Cir. 1998) ..........................................................................7

*Robert Findlay Mfg. Co. v. Hygrade Lighting Fixture Co.,*
    288 F. 957 (E.D.N.Y. 1923) .......................................................................... 5-6

*Saxe v. Hammond,*
    21 F. Cas. 593 (D. Mass. 1875) (No. 12,411) ...................................................6

**Statutes**

35 U.S.C. § 101 .................................................................................................6

35 U.S.C. § 116 .................................................................................................6

35 U.S.C. § 271 ............................................................................................. 5-7

**Rules**

Federal Rule of Civil Procedure 65(d) ...........................................................4

1.     Freedom Wireless, Inc. ("Freedom") acknowledges, as it must, that the district court extended its injunction to reach the continuing combined activities of Nextel[1] and Boston Communications Group, Inc. ("BCGI") that had *not* been put at issue below and did not form the basis for the jury's verdict. Freedom nonetheless claims the resulting injunction, though directed at Nextel (and other non-parties), is a perfectly ordinary, "standard-fare" injunction. It bases its argument on two false premises.

First, Freedom suggests that it has simply obtained a jury verdict directed at the individual activity of BCGI. Second, building on the first premise, it argues that by acquiring the right to enjoin BCGI from continuing, by its own actions, to infringe the patents in suit, Freedom thus (so goes the argument) could apply for and obtain a "typical" injunction that bars persons acting in "active concert with" the infringer – aiders and abettors – from facilitating further infringement. *See* Freedom Opp'n at 3.

Neither of Freedom's two rhetorical premises accurately reflects this case. Freedom did *not* proceed in this case by demonstrating that BCGI – acting alone – had infringed. As reflected on the four separate verdict form findings, it proceeded

---

[1]     As in their motion, Nextel Communications, Inc. and Nextel Operations, Inc. are collectively referred to as "Nextel."

on an untested, novel theory of joint infringement under which the combined

actions of various pairs of defendants were shown to have infringed,

notwithstanding the fact that the independent actions of no single defendant,

standing alone, did so.  Nextel was not included in any of those pairs of defendants

whose combined actions were adjudged in this case.  And both the district court

and Freedom made it quite clear – at least *before* the injunction issued – that the

question whether the BCGI and Nextel's combined actions (or BCGI and Alltel's

combined actions) also infringed was simply not at issue in this case.  Those

questions were being determined in separate cases, in which the parties whose

actions were at issue had actually been named as defendants and were thus given

an opportunity to defend themselves.  *See* Motion to Stay Injunction Pending

Appeal at 6.  In connection with the injunction briefing before the trial court,

Freedom again made the limitations on the scope of the injunction clear.  *Id.* at 7-8.

Thus, Freedom neither sought nor obtained a verdict directed at the

individual activities of BCGI, standing alone, and the scope of "in concert with"

relief that it might have obtained had it done so is beside the point.  The issues

presented here instead arise out of Freedom's own decision to proceed and prevail

on a joint infringement theory – and then to jettison the implications of that theory

when seeking its injunction.  Until the injunction, the BCGI-Nextel combination of

- 2 -

conduct was not at issue and Nextel was very much a non-party to the proceedings below.

Extending an injunction to reach conduct *not* adjudicated to be infringing, and to reach the actions of non-parties, is hardly the "standard-fare" approach that Freedom claims to be following. Quite the contrary, recent Federal Circuit precedent stands squarely for the proposition that an injunction directed against third parties in such circumstances would be improper. The Court has recently issued two opinions in the matter of *International Rectifier Corp. v. Samsung Elec. Co.*, 361 F.3d 1355 (Fed. Cir. 2004), *and* 424 F.3d 1235 (Fed. Cir. 2005), in a closely analogous fact pattern. In *Samsung*, the district court entered a permanent injunction, which it subsequently purported to broaden to reach the activities of a non-party ("IXYS"). IXYS then intervened to "clarify, vacate or modify" the injunction, on grounds that the court had exceeded its jurisdiction by directing it at IXYS's activities. The plaintiff responded by contending that the activities were simply "in concert" with the named defendant.

The Federal Circuit reversed the district court in both its opinions. In language that would apply perforce to Freedom's joint infringement theory, the Court first noted that the basis for the district court's injunction was "tantamount to conspiracy to infringe a patent, a theory which has no basis in law." 361 F.3d at 1361. The Court made clear in any case that the injunction improperly extended

- 3 -

beyond the activities at issue that were found to have infringed. *Id.* at 1362

("IXYS, as a non-party, cannot be bound by the Permanent Injunction.").

Moreover, in response to the contention that IXYS's rights could properly have

been evaluated in connection with issuance of the injunction, the Court held (in its

2005 opinion) that "It is difficult to imagine how a judgment that does not mention

a party or a claim asserted against a party can be considered" a proper basis for

relief. *Samsung*, 424 F.3d at 1240; *see also Additive Controls & Measurement*

*Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996).  There is nothing

conventional or ordinary in the way that Freedom has interpreted this injunction to

extend to conduct that was not at issue in the case, or adjudicated to be improper,

and to persons who were not parties to this case.

      Moreover, contrary to Freedom's suggestion, the question presented here

does not merely involve a non-party alleged to be "in active concert" with an

infringer, accused of "abetting" further infringement.  *See* Fed. R. Civ. P. 65(d).

To be properly subject to the injunction, the non-party must be abetting the activity

actually found to be infringing.  The liability finding upon which the injunction

was based here, however, involved joint infringement, where the act of

infringement itself involved at least two parties, each defendants in the action.  For

a third party to be properly bound as the "aider and abettor" of the conduct found

to infringe, it would have to be acting "in active concert with" *both* defendants

whose combined actions constitute the infringement, not merely one, whose

actions alone do not infringe. The injunctive powers of the court cannot be used to

render conduct unlawful that is not properly considered infringing under the Patent

Statute. *See Samsung,* 361 F.3d at 1361 (rejecting effort to use the injunction to

create liability, in effect, for conspiracy to infringe, not specifically actionable

under the Act).

In sum, this appeal poses significant issues in connection with Freedom's

effort to extend the district court's injunction to conduct not adjudicated as

unlawful in the underlying action, and to persons who were not parties to the

underlying action.

2.     Freedom argues that Section 271 *sub silentio* preserved the common

law doctrine of "joint infringement" under the heading of direct infringement, as

captured by Section 271. But joint infringement at common law was an entirely

different concept from the joint infringement now sponsored by Freedom. Prior to

enactment of the 1952 Patent Act, joint infringement was an intentional tort. *See,*

*e.g., Gerosa v. Columbia Metal Stamping & Die Co.,* 8 F.2d 611, 611-12 (6th Cir.

1925) (finding joint infringement when the party "knowingly and intentionally had

contributed to" the infringement); *Robert Findlay Mfg. Co. v. Hygrade Lighting*

*Fixture Co.,* 288 F. 957, 958 (E.D.N.Y. 1923) ("'Where an infringement of a

patent is brought about by concert of action between a defendant and complainant's

- 5 -

licensee, all engaged *directly and intentionally* become joint infringers.'")
(emphasis added) (quoting *New Jersey Patent Co. v. Schaeffer*, 159 F. 171, 173
(C.C.Pa. 1908)); *Saxe v. Hammond*, 21 F. Cas. 593, 594 (D. Mass. 1875) (No.
12,411) ("the mere manufacture of a separate element of a patented combination,
unless such manufacture be proved to have been conducted for the purpose, and
*with the intent of aiding infringement*, is not, in and of itself, infringement.")
(emphasis added).  Joint infringement thus was the precursor not of direct
infringement, but of contributory infringement under 35 U.S.C. § 271(c) – which
requires "knowing" misconduct.  As such, it was designed to reach only those
parties who knowingly and intentionally sought to aid and abet the acts of
infringement.  *See, e.g., Gerosa*, 8 F.2d at 611-12; *Robert Findlay Mfg. Co.*, 288 F.
at 958; *Saxe*, 21 F. Cas. at 594.  Thus, if as Freedom suggests, the concept of joint
infringement need only be coextensive with pre-1952 case law, that doctrine
clearly will not bear the weight that Freedom now seeks to impose on it.

    Perhaps recognizing this difficulty, Freedom observes that the word
"whoever," which is used in the portion of Section 271 describing direct
infringement, is also a word which under a different statutory provision (Section
101) has been held to encompass joint inventorship.  Freedom Opp'n at 6-7.  Yet
this proves too much.  First, joint inventorship – unlike joint infringement – is the
subject of a separate codified provision in the Patent Act, 35 U.S.C. § 116.

Second, joint inventorship, even if it were analogous to joint infringement, teaches only that two parties may assume *joint* responsibility under the Patent Act only when they knowingly *intend* to do so. *See Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("Joint inventorship under section 116 can only arise when collaboration or concerted effort occurs . . . ."); *accord Invitrogen Corp. v. Clontech Labs., Inc.*, --- F.3d ---, 2005 WL 3078495, at *8 (Fed. Cir. Nov. 18, 2005) (holding that inventorship requires an understanding and appreciation of the invention, including "that [the inventor] understood his creation to have the features that, comprise the inventive subject matter at bar").

In any case, the provisions of Sections 101 and 271 are not parallel provisions, and this Court's precedents reflect that where general words are used in two different places in the patent law, they may be given a meaning in each that reflects the structure, policies and purposes of each section. *See Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1445 (Fed. Cir. 1998) (reasoning that it is "not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance"). Thus, particularly in light of the alternative bases of liability expressly set forth in Section 271, it does no violence to the Patent Act to construe "whoever" as a single person in the context of Section 271, while recognizing that

"whoever" may encompass multiple, intentional collaborators in the context of Section 101.[2]

In sum, this case plainly presents substantial issues on the questions whether there is a separate doctrine of joint infringement and, if there is such a concept in the patent laws, what constitutes joint infringement.

3.    Freedom attempts to fall back on an additional and entirely contrived argument that the jury "might have" adjudicated BCGI's rights separately because it was improperly so instructed.  In support of this view, Freedom refers at various points to evidence that it says it presented in connection with other theories, and snippets from the jury instructions. *See, e.g.*, Freedom Opp'n at 10 n.8.  Without citing the record, Freedom baldly and inaccurately states that "the jury's verdict [sic] did not set forth particular findings on these theories."[3]  Freedom is flatly

---

[2]    Moreover, even if "whoever" *could* refer to multiple persons in Section 271, this would not be mean that the standards under which their combined actions gives rise to liability would be precisely the same as the standards that would be applied to find joint inventorship in connection with Section 101.  The contexts are simply too different to suggest that standards developed in one arena can simply be carried over to another.  *See 3D Systems, Inc. v. Aarotech Labs, Inc.*, 160 F.3d 1373, 1379 n.4 (Fed. Cir. 1998) (declining to apply the meaning of Section 102(b) "on sale" bar to Section 271 "offer for sale;" noting that underlying policies for patentability have "no resonance" with the underlying policies for infringement).

[3]    Citing to the trial transcript of April 13, 2005, Freedom claims that the jury was instructed "at length" on how use of the "system" would constitute infringement.  *See* Freedom Opp'n at 10-11.  This portion of the trial testimony,

(continued...)

- 8 -

wrong. The judge sent this case to the jury only on joint infringement theories. All four jury verdict forms specifically and solely asked the jury to find if the BCGI-carrier pairings "jointly literally infringed" or "jointly infringed under the doctrine of equivalents." *See, e.g.*, Ex. B to Motion to Intervene for Limited Purpose (Jury Verdict). Accordingly, the jury based its finding of infringement solely on joint infringement.

       4.      Finally, Freedom invokes the rule that favors the grant of an injunction after a finding of infringement. That rule applies where the conduct that is the subject of the injunction has already been finally adjudged as infringing, and the party that is the subject of the injunction has been found to have infringed. That presumption has *no* application to conduct that has *not* yet been found to infringe, or to the extension of the injunction to persons who were *not* parties to the proceedings, and who have not been adjudged to have engaged in any improper activities. The stay sought by Nextel is confined to conduct that has not yet been adjudged as unlawful and parties who were not part of the proceedings below.

---

(...continued)

however, is merely the direct examination of BCGI's technical expert; no such instructions are present.

## CONCLUSION

To the extent the district court's injunction reaches the combined activities of BCGI and Nextel, the injunction should be stayed pending appeal.

November 28, 2005                    Respectfully submitted,

                                     NEXTEL COMMUNICATIONS, INC.
                                     AND NEXTEL OPERATIONS, INC.
                                     By its attorneys,


                                     _Richard McMullan_
                                     Richard McMillan, Jr.
                                     Clifton S. Elgarten
                                     Michael J. Songer
                                     CROWELL & MORING, LLP
                                     1001 Pennsylvania Avenue, N.W.
                                     Washington, D.C.  20004-2595
                                     Telephone: (202) 624-2500
                                     Facsimile:  (202) 628-5116

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2005, I caused true and correct copies

of the Reply in Support of Motion to Stay Injunction Pending Appeal to be served

on the following by facsimile and by a third-party commercial carrier for overnight

delivery:

AT&T WIRELESS PCS, CINGULAR WIRELESS LLC, and CMT PARTNERS:
>          Claudia Wilson Frost
>          Mayer, Brown, Rowe & Maw, LLP
>          700 Louisiana Street, Suite 3600
>          Houston, TX 77002
>          Telephone: (713) 547-9636

BOSTON COMM. GROUP, INC. and WESTERN WIRELESS CORP.:
>          Donald R. Dunner
>          Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
>          901 New York Avenue, N.W., Suite 1100
>          Washington, DC 20001-4413
>          Telephone: (202) 408-4062

FREEDOM WIRELESS, INC.:
>          Frank P. Porcelli
>          Fish & Richardson P.C.
>          225 Franklin Street
>          Boston, MA 02110-2804
>          Telephone: (617) 542-5070

ROGERS WIRELESS, INC.:
>          Mark D. Wegener
>          Howrey LLP
>          1299 Pennsylvania Avenue, N.W.
>          Washington, DC 20004-2402
>          Telephone: (202) 783-0800

Brian M. Koide

# EXHIBIT G



**FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER** LLP

901 New York Avenue, NW ▪ Washington, DC  20001-4413 ▪ 202.408.4000 ▪ Fax 202.408.4400
www.finnegan.com

DONALD R. DUNNER
202-408-4062
don.dunner@finnegan.com

November 28, 2005

The Honorable Jan Horbaly
Clerk of Court
United States Court of Appeals
  for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

***BY HAND DELIVERY***

Re:    ***Freedom Wireless v. Boston Comm, 06-1020***

Dear Mr. Horbaly:

    On November 14, 2005, Boston Communications Group, Inc. ("BCGI") filed an
emergency motion in which it asked the Court either to construe the district court's injunction as
not applying to non-defendants or, to the extent it does, to stay the injunction pending resolution
of BCGI's appeal.  In an order issued on November 15, 2005, the Court temporarily stayed the
injunction "pending receipt of Freedom's response and consideration by the court of the papers,"
and required Freedom (as well as the appellees, "if they wish") to respond by November 22,
2005.  To the best of BCGI's knowledge, Freedom, but none of the appellees, filed a response
on November 22.  Today, BCGI is filing a motion for leave to reply to Freedom's response,
along with a proposed reply.

    Even though the injunction has now been temporarily stayed, BCGI has recently learned
that some of its non-defendant carriers are concerned enough about the possibility that the
injunction may be construed to cover them—and not stayed pending resolution of BCGI's
appeal—that they are attempting to find an alternative supplier for BCGI's services.  If this
occurs, and non-defendant carriers sever their current relationship with BCGI, BCGI's continued
existence may be seriously jeopardized.  Accordingly, BCGI respectfully requests that the Court
rule on BCGI's pending motion in as expedited a fashion as possible.

Respectfully submitted,

Donald R. Dunner
*Counsel for Boston Communications Group, Inc.*

Washington, DC ▪ Atlanta, GA ▪ Cambridge, MA ▪ Palo Alto, CA ▪ Reston, VA ▪ Brussels ▪ Taipei ▪ Tokyo

The Honorable Jan Horbaly
November 28, 2005
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

cc:    Marshall M. Searcy III (by email)
       Richard McMillan, Jr. (by email)
       Claudia Wilson Frost (by email)
       Mark D. Wegener (by email)